THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
NICK McDOWELL, Defendant-Appellant.

First District (4th Division)   No. 82—1284

Opinion filed January 19, 1984.—Rehearing denied February 29, 1984.

James J. Doherty, Public Defender, of Chicago (Patricia J. Handlin and James H. Reddy, Assistant Public Defenders, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Lawrence R. Stasica, and Rhonda W. Davis, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'CONNOR delivered the opinion of the court:

Defendant Nick McDowell was convicted after a jury trial in the circuit court of Cook County of attempted rape, two counts of deviate sexual assault, attempted armed robbery, and unlawful restraint, and he was sentenced to 12 years imprisonment for attempted rape, deviate sexual assault and attempted armed robbery, the sentences to be served concurrently. He appeals, contending (a) the State wrongfully withheld blood samples which were the only evidence that could have exculpated him, (b) the identification made by the complainant was not clear and convincing, and, (c) the trial court improperly allowed the State to present prejudicial hearsay testimony to the jury.

The complainant testified she was in her car at a parking lot near the University of Illinois-Chicago campus on April 15, 1980, when a man approached the driver's side. After she refused to roll down the window, the man pointed a gun at her and walked around the front of the car to the passenger's side. He entered the front seat after the complainant opened the door. She observed the man was wearing a black wool cap with a visor, long black twill coat, beige pants and a light colored shirt. He was about six feet tall.

The man asked for money and searched the complainant's coat and book bag. She offered to cash a student grant check. The man ordered her to drive to an empty lot nearby. There, the man ripped the complainant's sweater and told her to get in the back seat and take her clothes off. The man ripped her sweater again as she hesitated. He then climbed into the back seat and attempted to have intercourse with her. The man rolled her over and had anal intercourse with her. When he was through, the man pulled her by her hair and forced her mouth onto his penis. The complainant noticed that the man's penis was bleeding.

After dressing, the man told complainant to drive to a currency exchange on Taylor Street. Accompanying her inside, the man threatened her if she sought help. The complainant endorsed the student check and also wrote the word "help" under her signature. The currency exchange teller asked the man what he was doing and he then fled down an adjacent alley. Complainant was taken to the Mother Cabrini Hospital by police. She had not been bleeding, but she noticed blood on her clothes.

Complainant worked with a police artist to make a composite

drawing of the attacker. The sketch was distributed although the complainant admitted on cross-examination that the drawing looked nothing like the defendant. She also testified she had told the police that the drawing did not look like her attacker. She was also shown photos several times by the school security police. She did not identify anyone but indicated one photo looked like her attacker. She also attended a lineup soon after the incident and did not identify anyone.

Approximately nine months after the incident, on January 16, 1981, the complainant saw a man she identified as her attacker standing in a class registration line at Malcolm X College. The man was wearing a wool knit ski cap, blue coat and beige pants when he was arrested in a classroom by school security police. The complainant made a positive identification of the defendant at trial as her attacker.

Dr. Maja Jagasia testified she examined the complainant in the emergency room at the hospital. It took 10 to 15 minutes to calm her down and find out what happened. Dr. Jagasia conducted an examination and prepared a Vitullo Rape Kit. She found complainant suffered no external wounds but did observe blood on complainant's foot, thighs and jacket.

Josephine Deletto, the teller at the currency exchange, testified that the complainant came into the currency exchange and endorsed a check with her name and the word "help." Upon noticing this the witness summoned the police and asked a man near the entrance of the currency exchange if she could help him with anything. The man told her he wanted a stamp and walked out of the currency exchange. She described this man as tall, "like six feet," slender and in his early 20's.

She further testified that defendant looked like the man she saw in the currency exchange but could not make a positive identification. She also had viewed a lineup on January 17, 1981. Of the five people in the lineup, she thought one looked like the man in the currency exchange, but she was not positive. She identified a photograph of the lineup and the man she picked out. She testified this man looks like the defendant. On cross-examination, she reiterated she was not positive of her identification of the man in the lineup as the one she saw in the currency exchange. She also could not be sure the man in the lineup was the defendant.

Richard Law testified that he was assigned to investigate this case on the day of the incident. He stated the complainant was shown numerous photographs. She also viewed a four person lineup on the evening of the incident without identifying anyone. On cross-examination, he stated that on one occasion the complainant picked out a pho-

tograph of a man who looked "very much" like the offender. It was not a photograph of defendant.

James Griffin was the Chicago police detective assigned to this case on January 16, 1981, the day defendant was taken into custody. He spoke with the defendant and gave him his *Miranda* rights. He asked defendant where he was on April 15, 1980. After finding out that date was a Tuesday, defendant told him that he was in school. An assistant State's Attorney later asked the same question and received the same answer. During cross-examination Griffin stated defendant denied participation in the incident and stated he was probably in school on the date of the incident. Griffin also testified that defendant was not charged until January 17, 1981.

Thomas O'Malley worked for the Chicago Board of Education. In April 1980, he worked at a special education facility known as the Chicago Program Center. At the time, he was acting assistant principal supervising the teachers. He identified defendant as a participant in the program from April through June 1980. He also identified an attendance book kept by the teacher for the classroom assigned to defendant. This attendance book indicated defendant was absent from school the entire day on April 15, 1980. O'Malley stated on cross-examination that he did not keep the attendance book and had no independent knowledge of whether defendant was in school on April 15, 1980.

The State's final witness was John Quattrocki of the Chicago Police Department Crime Laboratory. He tested the blood stains found on the complainant's clothing. He also analyzed the samples of blood taken from the complainant and defendant. He determined the blood stains were type A blood. Complainant's blood was type O and the defendant's blood was type A. Quattrocki stated the clothing was kept in the evidence property section of the police headquarters. That section is located in the subbasement of the building where there are no temperature or humidity controls and the temperature fluctuates from 40 degrees in the winter to as high as 105 degrees in the summer. Of the general population in the United States, he testified, 40% to 45% of the people have type A blood. In the black population, of which defendant is also a member, 27% have type A blood. His examination took place over the last two weeks in December, 1981.

On cross-examination, Quattrocki stated the clothing and Vitullo Rape Kit were received at the crime laboratory on April 16, 1980. He examined the rape kit in 1980 but did not do any tests on the clothing at the same time. Quattrocki also stated blood stains could deteriorate with the passage of time. The Chicago Police Department did not pre-

serve extracts of blood stains from clothing in liquid-nitrogen-filled test tubes. He was unfamiliar with the procedures used by other law enforcement agencies. He was aware, though, of methods to preserve blood stains.

Quattrocki further testified on cross-examination that blood may not be tested indefinitely, although there are determinations that can be made. The validity of such determinations are another matter. He also testified that blood may be tested for subtypes, that type A blood may differ according to subtype, and therefore be from different sources. He did not do any subtyping tests in this case.

Emmett Harmon testified for the defense. He is an analytical bio-chemist and technologist at Oak Park Hospital and owns a clinical lab for forensic studies. He received the clothing and blood samples from the crime lab. Harmon explained various systems of establishing blood types, among them the common ABO system and the Rh factor system. Different recognizable antigens on the surface of a blood cell allows for blood typing to be done. He tested the blood stain on the panties and the vial containing defendant's blood sample for Rh antigen activity. Defendant's blood sample exhibited an "Rh antigen-like activity" while the stain did not have "Rh antigen-like activity." It was his conclusion that the blood in the vial and the stain on the panties were not of the same origin. Harmon stated that blood stains may be studied for years, and he has successfully tested four-year-old stains. He also stated that based upon his research and experience the Rh antigen system is as stable as the ABO antigen system.

Upon cross-examination, Harmon stated he examined the clothing before making any tests. He did this to determine whether the material had been damaged during storage. He did not do any tests related to the ABO system. Harmon further described the steps he took in preparing the blood stain.

Harmon again testified that the ABO and Rh systems are the hardiest for testing purposes. He did state, however, that extreme heat and cold would make a blood stain more difficult to analyze. Admitting that some literature indicates that conclusions from negative typing in the Rh testing of older stains is unreliable, Harmon stated the more recent literature has found that not to be true. Harmon denied the negative finding he made of Rh activity in the extract from the panties was a false reading.

The State presented the testimony of Frank Stolorow as a rebuttal witness. He is the serology coordinator for the State crime lab bureau at the Training and Applications Laboratory of the Illinois Department of Law Enforcement. He testified to the procedures he

would use in making an Rh antigen test on blood stains. He stated that his lab does not use the method used by Harmon when testing a blood stain for Rh type because it is "less sensitive" than other tests.

Stolorow indicated the term false negative in serology refers to results of an analysis that would indicate the absence of a factor when in fact the factor was originally present. He testified that environmental conditions could cause a false negative finding. These conditions, such as bacteria, humidity, sunlight and extremes in temperature, can lead to the gradual decomposition of a blood stain. Based on literature and his experience, Stolorow placed the time dependability for the Rh analysis of blood stains between six months and one year. He further stated that conclusions can be drawn no matter how old the stain, but, the significance of the age of the stain is important in drawing the conclusion about the absence of what is found.

He concluded by expressing his opinion that the ABO system is more stable in dry blood stains that the Rh system. On cross-examination he stated there are numerous techniques of preserving blood stains. He stated the Department of Law Enforcement is supplied with liquid nitrogen containers in which liquid blood stains are stored.

Defendant first argues he was denied a fair trial because the State wrongfully withheld dried blood samples which could have provided exculpatory evidence. Defendant contends the State allowed the blood samples to deteriorate before testing them and finally allowing the defense to make tests. It is further argued the State violated its duty of disclosure by improperly preserving this possible exculpatory evidence. *United States v. Bryant* (D.C. Cir. 1971), 439 F.2d 642; *People v. Taylor* (1977), 54 Ill. App. 3d 454, 369 N.E.2d 573; 87 Ill. 2d R. 412.

According to the State's case-in-chief, the blood type of the stains on the complainant's clothing matched that of defendant's blood. Defendant's expert determined that the subtypes of the blood stains and defendant's blood differed. He concluded the blood stains could not have come from defendant. The State's expert testified in rebuttal that the subtyping analysis used by defendant's expert was unreliable because of the gradual decomposition of the blood stains. Defendant concludes that because the blood stains were favorable, or potentially favorable, and were material to his guilt or innocence, the State's withholding them violated its duty of disclosure and his convictions cannot stand. *People v. Weaver* (1982), 92 Ill. 2d 545, 442 N.E.2d 255; *People v. Nichols* (1976), 63 Ill. 2d 443, 349 N.E.2d 40; *People v. Keith* (1978), 66 Ill. App. 3d 93, 383 N.E.2d 655.

■ The State argues that it properly handled the clothing since

normal procedures were followed and the evidence was stored at police headquarters. It further contends there was no suspect or pending proceedings at the time it received the clothing and that it did not have the duty to test the clothing or preserve it so that every possible test could be performed. We disagree. The duty of the State to disclose evidence to a defendant (*Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194) must attach to the State when it has first gathered and taken possession of evidence to a crime. "Otherwise, disclosure might be avoided by destroying vital evidence before prosecution begins or before defendants hear of its existence." (*United States v. Bryant* (D.C. Cir. 1971), 439 F.2d 642, 651; see *People v. Moore* (1978), 61 Ill. App. 3d 694, 378 N.E.2d 516; *People v. Taylor* (1977), 54 Ill. App. 3d 454, 369 N.E.2d 573.) This is not to say the State has a duty to disclose at the investigatory stage, but that a duty to preserve exists so that independent analysis and tests may be made by a punitive law violator. (54 Ill. App. 3d 454, 457; see 87 Ill. 2d R. 412(e)(i), (g).) Not only does such a rule protect the rights of the defendant, but also society's interest in the integrity of the judicial system. (*People v. Nation* (1980), 26 Cal. 3d 169, 604 P.2d 1051, 161 Cal. Rptr. 299.) However, this issue standing alone is not dispositive of defendant's case.

■ We must determine whether the State has breached its duty to preserve evidence, and if so, what effect this breach would have on defendant's convictions. The duty to preserve evidence focuses on the fairness of the trial process. We recognize the prosecution's link to law enforcement agencies and the attendant advantage in obtaining evidence. (*People v. Vargas* (1983), 116 Ill. App. 3d 787, 452 N.E.2d 736; *People v. Ruffalo* (1979), 69 Ill. App. 3d 532, 388 N.E.2d 114; see *United States v. Bryant* (D.C. Cir. 1971), 439 F.2d 642.) Defendant contends the physical evidence and laboratory reports were not tendered even though oral requests were made during 11 court dates over 11 months. During this time those reports were ordered by the prosecutor. The record reveals that most of the time spent during these, and other, hearings was directed at securing the police reports from the University of Illinois-Chicago and Malcolm X College security police. Also during this time, continuances were agreed to by defense counsel, often without any specific request for the lab reports. While it may be theoretically possible that a more complete analysis might have been undertaken had the police made added efforts to refrigerate the blood stains, under the circumstances of this case we cannot say the State's actions amounted to a breach of its duty.

Although there might have been an element of unfairness if it ap-

peared that no effective testing could have been made, this is not the case here. (See *People v. Moore* (1978), 61 Ill. App. 3d 694, 378 N.E.2d 516.) In *People v. Moore*, the failure to refrigerate the evidence, a sample of defendant's saliva, did not violate the duty "not to dispose of evidence" where the defendant's expert categorically stated the sample could be successfully tested. In our case, defendant's expert, Harmon, testified that blood stains may be studied for years and had successfully tested stains which were four years old. He further stated his opinion that the Rh system, upon which his test was predicated, was as stable as the ABO system. Harmon also noted that he examined the clothes and stains for the effect of storage. The State's rebuttal expert, Stolorow, in challenging Harmon's conclusions, questioned the methodology used by Harmon. Stolorow also stated that environmental conditions can lead to the gradual decomposition of blood stains, and, based upon his experience and study, the time dependability for Rh analysis was six months to one year. The jury was fairly given the opposing sides of the argument and we find no prejudicial error. *People v. Moore* (1978), 61 Ill. App. 3d 694, 378 N.E.2d 516.

Defendant next argues that he was not proved guilty beyond a reasonable doubt because complainant's identification is weak and was improperly corroborated by the blood analysis discussed above. Defendant claims complainant's identification, coming nine months after the incident was not sufficiently clear and convincing, citing *People v. Eichelberger* (1980), 81 Ill. App. 3d 1012, 401 N.E.2d 1208. He also contends the clothes he wore when first identified by the complainant (ski cap, beige pants and blue coat) led her to erroneously believe the defendant was her attacker.

The positive and credible testimony of one identification witness is sufficient to support a conviction if the witness had the opportunity to observe the accused for a sufficient length of time. (*People v. Dotson* (1981), 99 Ill. App. 3d 117, 424 N.E.2d 1319.) It is the function of the trier of fact to pass upon the credibility of the witnesses and the weight of the evidence. (*People v. Secret* (1978), 72 Ill. 2d 371, 381 N.E.2d 285.) The lapse of time between the incident and the complainant's identification of defendant goes to the weight of the testimony; it does not destroy its credibility. *People v. Rodgers* (1972), 53 Ill. 2d 207, 290 N.E.2d 251.

■ The complainant had ample opportunity to observe defendant during the incident which occurred during the middle of the day. *People v. Eichelberger* is inapposite to this case, and defendant's reliance thereon is misplaced. A criminal conviction will not be set aside by a

reviewing court unless the evidence is so improbable as to raise a reasonable doubt of guilt. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.) A review of the record convinces us that the evidence presented provided an ample basis for the jury's determination of guilt.

Defendant argues a new trial is warranted because the trial court allowed the State to present the prejudicial and incompetent hearsay testimony of the arresting officer, Griffin. During preliminary questioning, Griffin testified that, after taking defendant into custody on January 16, 1981, he asked defendant where he was on the date of the incident. Griffin testified defendant asked what day of the week it was and then said that he probably was in school. School records indicate defendant was absent from school on the day of the incident.

■ Defendant contends this testimony was inadmissable hearsay which was improperly impeached by the school attendance record, citing *Chambers v. Mississippi* (1973), 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038, and *People v. Fritz* (1981), 84 Ill. 2d 72, 417 N.E.2d 612. These cases are inapposite to the circumstances found in this case. Defendant's statement to Griffin was an admission. An admission is a statement of independent fact by a party which, when taken in connection with other facts, may lead to an inference of guilt of the alleged crime. (*People v. Olbrot* (1982), 106 Ill. App. 3d 367, 435 N.E.2d 1242.) This was an admission because the assertion, when considered with other proof which showed it was erroneous, indicated a consciousness of guilt (McCormick, Evidence sec. 144, at 310 (2d ed. 1972)) and it is admissible as substantive evidence for the purpose of showing guilt (*People v. Burns* (1981), 99 Ill. App. 3d 42, 424 N.E.2d 1298).

For the reasons stated, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

ROMITI and JIGANTI, JJ., concur.