THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EDWARD ROSS, Defendant-Appellant.

First District (2nd Division)   No. 83—2478

Opinion filed March 12, 1985.—Rehearing denied May 21, 1985.

Jenner & Block and Howard Reich, both of Chicago (Thomas P. Sullivan, Laura A. Kaster, and Gail Rubin, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat and Peter D. Fischer, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE STAMOS delivered the opinion of the court:

Defendant Edward Ross was convicted of murder in a bench trial for the November 4, 1981, shooting of his ex-wife Betty and was sentenced to 30 years' imprisonment. Defendant appeals his conviction.

In 1981, defendant was 49 years old and his ex-wife Betty was 47 years old. Defendant and his ex-wife were twice divorced, having been married in 1973, divorced and remarried in 1977 and divorced again in 1978. They continued to see each other frequently after the second divorce.

In October of 1981, Betty traveled to San Francisco on business, stopping on the way back in Las Vegas, where she met Jana Nuter, her daughter by a previous marriage. Betty returned to Chicago on the morning of November 4, and was met at the airport by defendant, who drove her to his apartment in Des Plaines. After arriving from the airport, Betty and defendant ate and went to bed, where they talked and engaged in sexual intercourse. Defendant testified that he got out of bed and went to the bathroom to put on his pajamas, the bedroom being completely dark. He returned to the bedroom and lay down on the bed. As he lay awake, he heard an "explosion" and rolled across Betty's side of the bed and ran into the hallway, where he heard another explosion. He returned to the bedroom, turned on a closet light and saw Betty lying near the bed with a gunshot wound in her head. Defendant took an oxygen tank from his side of the bed and placed the mask on Betty's face. He then telephoned for help and opened the apartment door.

Officer Winek of the Cook County sheriff's police testified that on

November 4, 1981, between 9 and 9:08 a.m. the sheriff's office in Des Plaines received a telephone call reporting a shooting at defendant's apartment. Officer Winek, his partner Bryant and three paramedics went to the apartment, where they found the door open. Upon entering the master bedroom, Winek observed defendant kneeling over Betty and attempting to administer oxygen. When defendant saw Winek, he said, "Help her. Help her." Winek handcuffed defendant and the paramedics began to administer aid to Betty. Betty was taken to Lutheran General Hospital, where she died later that day.

Officer Winek was the only witness who saw the master bedroom before the paramedics entered with their equipment and moved Betty. When Winek first entered the bedroom, Betty was lying on her back on the floor near her side of the bed. She had a bullet wound in her left temple. A revolver was on the floor between Betty and the bed, approximately two feet to Betty's right. After Winek handcuffed defendant, the paramedics entered the bedroom. One removed the shade from the window and the others moved Betty toward the foot of the bed and began to administer first aid. Winek took defendant to the second bedroom, where he noticed that defendant had been shot in the inside of his upper right thigh.

Evidence technicians arrived at approximately 9:10 a.m. Although they instructed the police officers and paramedics not to disturb the scene, numerous objects had already been moved by the paramedics in the course of treating Betty. Photographs were taken of the room. The technicians observed a purse filled with blood on defendant's side of the bed and a revolver on the floor. The purse had been moved by the paramedics. The gun, upon which no fingerprints were found, had blood on both sides of its frame.

Four bullets were recovered from the room. One was recovered from Betty's head, one from the floor beneath Betty's side of the bed, one from the carpeting near the head of Betty's side of the bed, and one from the top of the sheets on the surface of the bed. This last bullet was stained with a red substance and was found near the head of the bed. A large bloodstain was present at the head of Betty's side of the bed. This stain was smeared toward the edge of the bed where Betty was found. Bloodstains were also observed in other places in the bedroom. Samples of these were taken, but because defendant and Betty shared the same ABO blood type, most of the samples proved inadequate to determine the source of the stains. Erethrocyte acid phosphatase (EAP) testing indicated that the large stain on Betty's side of the bed was made by her blood, that the stain on defendant's side of the bed was his blood, and that the large quantity of

blood found in Betty's purse was hers. The autopsy revealed that Betty's death had been caused by a contact gunshot wound to the left temple.

A firearms expert testified that all four bullets recovered from the scene had been fired from the gun found in the bedroom. This gun belonged to defendant and had been kept loaded in a drawer of the nightstand at defendant's side of the bed. An examination of defendant's pajama pants showed that he had been shot from a distance of less than six inches, but greater than contact. The bullet entered the front of his right thigh and exited at the rear.

Evidence introduced at trial revealed that Betty had experienced emotional problems several months before her death, but had been successfully treated for them; that the relationship between Betty and defendant was often troubled; that defendant was a gun enthusiast and an experienced marksman, and at the time of Betty's death owned several guns besides the one which killed Betty; that defendant denied shooting Betty when questioned by police immediately after the shooting; and that Betty did not like guns and was inexperienced in their use.

At trial, defendant maintained that Betty had committed suicide. He was tried before the bench, convicted of murder and sentenced to 30 years' imprisonment.

■ Defendant first contends that he was denied due process of law due to the State's failure to preserve material evidence. It is clear that the State has the duty to preserve and disclose possible exculpatory evidence to the accused in a criminal case. (*People v. McDowell* (1984), 121 Ill. App. 3d 491, 496-97, 459 N.E.2d 1018.) This duty to preserve and disclose evidence focuses on the fairness of the trial process. (121 Ill. App. 3d 491, 497.) We must therefore determine whether the State has breached this duty and, if so, what effect this breach would have on the fairness of the trial process.

Defendant first argues that the State withheld material evidence from him by failing to test his and Betty's hands for gunshot residue. However, a police investigator testified that, due to the contamination of Betty's hands by the presence of adhesive tape applied by the paramedics and by blood, and because defendant had been taken to the hospital, the investigator believed that reliable gunshot residue samples could not have been obtained from the hands of either person. Under these circumstances, we cannot say that the State's actions in failing to obtain gunshot residue evidence amounted to a breach of its duty to preserve evidence.

Defendant next argues that the State breached its duty to disclose

evidence by the failure of police investigators to obtain blood samples from the room in quantities sufficient to allow accurate testing to determine the sources of the various stains. The record shows that investigators used cotton swabs to collect blood samples. Expert testimony established that this method is not considered the most reliable for collecting such samples. While the failure of police to obtain sufficient samples of bloodstains may amount to a breach of the State's duty to preserve and disclose material evidence, it does not appear that any unfairness to defendant resulted from such failure here. The trial judge, in announcing his findings as to defendant's guilt, considered the size and location of the stains, rather than the results of the blood tests, in determining their origin. The judge found that the large stain at the head of Betty's side of the bed could, due to its size and shape, only have come from Betty's head wound. It therefore does not appear that defendant was prejudiced by the unavailability of samples of bloodstains found elsewhere in the room. In addition, given the multiplicity of stains and the fact that defendant and Betty shared the same ABO blood type, we do not find that the failure to obtain samples of all the stains was prejudicial, especially given defendant's argument, discussed below, that no accurate method exists to differentiate between the blood of persons who share the same ABO blood type. See *People v. McDowell* (1984), 121 Ill. App. 3d 491, 459 N.E.2d 1018.

■ Defendant also argues that the failure of the police to examine the bedsheets and the bullet found on the bed was a breach of the State's duty to preserve evidence. However, an examination of these items could only have shown whether Betty was shot while on the bed and whether defendant was shot in the leg by the bullet found on the bed, facts which are ascertainable from the available evidence. We therefore find that defendant was not prejudiced by the failure of the State to have these items examined.

■ Defendant next contends that the trial court's consideration of inadmissible evidence denied him his right to a fair trial. Defendant first contends that blood type evidence based on EAP testing, a method used to differentiate blood from persons who share the same ABO blood type, is inadmissible because it has not gained general acceptance in the scientific community. (See *People v. Baynes* (1981), 88 Ill. 2d 225, 240-45, 430 N.E.2d 1070 (regarding polygraph examinations).) However, the trial court in the instant case made its findings relative to the blood stains on the basis of their size and location, rather than the EAP test results. Therefore, we find that defendant was not prejudiced by the admission of this evidence.

■■ ■ Defendant also objects to the admission into evidence of two letters written by Betty. Defendant argues that these letters were inadmissible hearsay. The letters were intended to show Betty's state of mind at the time of her death and were admitted into evidence under the state-of-mind exception to the hearsay rule. Defendant argues that the State failed to show that the letters satisfied the two-fold basis for hearsay exceptions—necessity and a reasonable probability of truthfulness—in that it did not establish a reasonable probability that the content of the letters was true. See *People v. Reddock* (1973), 13 Ill. App. 3d 296, 304, 300 N.E.2d 31.

The first letter was written by Betty to her cousin in Yugoslavia. The letter contains statements indicating that Betty was in an optimistic mood immediately prior to her death. Defendant argues that because Betty's daughter testified that it was consistent with Betty's character to refrain from discussing her problems with her cousin, and because the letter omitted references to some of Betty's problems, the letter was inherently unreliable and was improperly admitted as evidence of Betty's state of mind. However, the letter does discuss several of Betty's more serious problems, including her past emotional problems, and the evidence as to Betty's state of mind was corroborated by the testimony of Betty's daughter and of one of her co-workers. In light of these facts, we cannot say the trial court erred in finding the exhibit to be reliable.

The second letter, dated October 5, 1981, was written by Betty to defendant and expresses Betty's displeasure with their relationship and indicates her desire to distance herself from defendant. Defendant argues that this letter was admitted without proper foundation because Betty's daughter, who identified Betty's signature on the letter, lacked personal knowledge of its contents. However, the foundation testimony was directed solely toward identifying Betty's signature. Therefore, Betty's daughter's lack of knowledge of the letter's contents does not affect the reliability of the statements made therein.

■■ Defendant next contends that he was not proved guilty of murder beyond a reasonable doubt because the evidence of his guilt was entirely circumstantial and the State failed to rebut defendant's reasonable hypothesis of suicide.

It has been held that a valid conviction may be based entirely on circumstantial evidence. (*People v. Williams* (1977), 66 Ill. 2d 478, 484, 363 N.E.2d 801.) It is necessary, however, that the proof be of a conclusive nature leading, on the whole, "to a satisfactory conclusion and producing a reasonable and moral certainty that the accused and

no one else committed the crime." (66 Ill. 2d 478, 484-85.) Where a conviction of murder rests solely upon circumstantial evidence, the guilt of the defendant must be so thoroughly established as to exclude every reasonable hypothesis of innocence. (*People v. Garrett* (1975), 62 Ill. 2d 151, 163, 339 N.E.2d 753.) It is not required that the facts be such as to exclude all imaginable situations wherein the defendant might possibly be innocent (*People v. Hargis* (1983), 118 Ill. App. 3d 1064, 1072, 456 N.E.2d 250) and "the trier of fact need not search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *People v. Rhodes* (1981), 85 Ill. 2d 241, 249, 422 N.E.2d 605.

In the instant case, certain facts are undisputed. It is clear that Betty died as the result of a single bullet wound to the temple. Expert medical testimony established that, although Betty could have moved about after the shot, it was far more likely that she collapsed where she was shot, fell immediately into a comatose state and died very shortly thereafter. It is undisputed that Betty was in defendant's apartment when she was killed and that the fatal shot was fired from a gun owned by defendant and kept loaded in his nightstand. It is also undisputed that Betty and defendant were alone in the apartment when the shooting occurred and that no third party is involved in this incident. Therefore, only two explanations for Betty's death are conceivable; she either killed herself or was killed by defendant.

Defendant contends that the evidence introduced at trial was insufficient to prove that Betty was killed by him, rather than by herself. Because defendant is the sole witness to what occurred in his bedroom on November 4, 1981, his testimony as to what transpired is crucial. Defendant testified as follows: He picked Betty up at O'Hare Airport as she returned from San Francisco in the early morning of November 4, 1981. The two drove back to defendant's apartment in Des Plaines, where they each had something to eat and drink and discussed their future. Betty told defendant that she wanted them to remarry. She took a bath and then went into the bedroom. Defendant and Betty undressed and got in bed. Defendant reached into the drawer of the nightstand next to his side of the bed for a condom, but did not remove one because Betty said, "I am safe." Defendant left the drawer open. Inside the drawer was a loaded .32-caliber revolver.

Defendant and Betty engaged in sexual intercourse. The room was in total darkness because defendant could not sleep in a lighted room and had covered the windows. After intercourse, defendant went to the bathroom to wash up. He put on his pajamas and came back to lie down on the bed. Defendant testified that Betty asked

"what they were going to do with the rest of their lives," and that he replied, "We have to see your mother at noon. We have to drive tomorrow to Traverse City. I am going to sleep." However, after the shooting, defendant told investigators that he had been arguing with Betty over her desire to remarry immediately prior to the shooting. Defendant testified that he lay down on the bed but did not fall asleep and that as he was lying in bed he heard an "explosion." He rolled out of bed and landed on his hands and knees on the floor near Betty's side of the bed, took two steps to get to his feet and ran down the hallway leading to the front door. He then heard a second "explosion" and returned to the bedroom, where he turned on the closet light and found Betty lying on the floor near her side of the bed with a bullet wound in her head. Defendant telephoned the operator and reported "a shooting." He then ran down the hall to open the front door, leaving the phone off the hook. After going to the bathroom to look for medical supplies, defendant returned to the bedroom to administer oxygen to Betty from a tank he kept. Such was the scene when the police arrived.

When the police and paramedics arrived, defendant was taken to a second bedroom and questioned. Until this time defendant had not noticed that he had been shot in the right thigh, and he did not know when he had been shot. Defendant was questioned by Officer Winek. When asked if he had shot Betty, defendant answered, "No." When asked if Betty had shot him, defendant replied, "I don't know." A few minutes later, Investigator Kraut asked defendant if he had shot Betty and was told, "No. I loved her," but when he asked defendant if Betty had shot him, defendant replied, "I won't answer that." When asked if Betty could handle a gun, defendant replied, "No. She was afraid of guns." To Kraut's questions of whether Betty had shot herself or whether defendant had shot himself, defendant replied, "I won't answer that," to both. Kraut then asked defendant how the shooting had occurred and was told, "I don't know."

In support of his contention that he was not proved guilty of murder beyond a reasonable doubt, defendant cites the decision of our supreme court in *People v. Garrett* (1975), 62 Ill. 2d 151, 339 N.E.2d 753. In *Garrett*, the court reversed the defendant's murder conviction on the basis of the State's failure to rebut the defendant's reasonable hypothesis of suicide. However, an examination of the facts in *Garrett* shows them to be dissimilar to those of the instant case. In *Garrett*, forensic evidence showed that the characteristics of the victim's wounds were equally consistent with murder or suicide. Other evidence introduced at trial revealed that the victim had been depressed;

that she had spoken of committing suicide; that she had just confessed to her husband that she was having an affair, and therefore had a motive to kill herself; and that she had left a note stating that she killed herself. None of these factors is present in the instant case.

An examination of the evidence adduced at trial in the instant case, and especially of defendant's testimony, reveals the implausibility of defendant's suicide hypothesis. The evidence at trial showed that defendant was a gun enthusiast and a marksman, yet he described the gunshots heard by him in the bedroom as "explosions." It is unlikely that a man with as much experience with firearms as defendant would be unable to identify the sound of gunshots. In addition, defendant claims to have heard only two shots, while the evidence shows that four were fired. Defendant's explanation of this discrepancy is that he was rendered temporarily deaf by the sound of the first shot and therefore heard only one of the other three. However, even considering the possibility that one of the shots was muffled because it was fired on contact into Betty's head, it is apparent that all the shots were fired within a period of only a few seconds, and it is unlikely that defendant's temporary deafness would abate quickly enough to allow him to hear another of the shots.

In addition, the fact that four shots were fired is itself inconsistent with defendant's hypothesis of suicide. Defendant proposes several scenarios to explain why Betty would have fired four shots when she intended to kill herself. Defendant argues that three of the shots were "hesitation shots," misses which defendant claims are often fired by persons attempting suicide before the fatal shot is fired. However, no evidence supporting defendant's theory of "hesitation shots" was introduced at trial. In addition, the location of the spent bullets is inconsistent with any claim that they were fired by Betty in an attempt to hit her left temple as she lay on the bed.

It is also significant that, although Betty had been shot in the left temple, the evidence adduced at trial shows that she was right-handed and that she had lost the ring finger of her left hand in an accident several years prior to her death, and consequently seldom used that hand. It is therefore highly unlikely that Betty would have held a gun with her left hand and shot herself in the left side of the head. Defendant's expert testimony that a study of 55 suicide cases involving right-handed people revealed that five of them shot themselves with their left hands does not demonstrate a significant probability that Betty would have used her left hand to shoot herself, especially in light of the permanent disabling injury to that hand and the evidence that she seldom used it.

Testimony was also presented that Betty was not able to handle guns and was, in fact, afraid of them. Defendant testified that he had taught Betty how to fire a handgun by having her fire two shots from their car into a cornfield outside a gun club in Elburn. We find that the trial court was clearly correct in finding this testimony to be incredible, it being unlikely that defendant and Betty would drive all the way to a firing range in Elburn, only to fire their gun into a cornfield outside the club, or that an experienced marksman would allow a gun to be fired from his car into a cornfield.

Defendant's telephone conversation with Betty's former husband, George Nuter, also casts doubt on defendant's suicide theory. Nuter testified that he received a telephone call from defendant a day or two after Betty's death, regarding funeral arrangements. After arguing with defendant about this subject, Nuter asked defendant why he killed Betty, and defendant replied, "I don't know. I don't know." Nuter then asked defendant, "You pulled the trigger, didn't you? You did kill her?" Defendant responded, "I know. I know."

Also significant is the fact that no fingerprints were found on the gun used in the shooting, an indication that the gun had been wiped clean by the person who last handled it. It would not, of course, have been possible for Betty to have wiped the gun clean if she had killed herself with it.

The evidence also showed that the bullet which passed through defendant's right leg was fired from a distance of less than six inches, and passed through an area of the leg not containing major nerves or blood vessels. The trial court's finding that the characteristics of this wound were more consistent with self-infliction than with infliction at the hand of another was not, in our opinion, unjustified, although no expert testimony was elicited regarding this question.

In contrast to the facts in *Garrett*, the evidence presented in the instant case is clearly more consistent with murder than with defendant's theory of suicide. The evidence shows that the large, smeared bloodstain at the head of Betty's side of the bed was most probably made by Betty's being shot while she was lying on the bed and then being slid onto the floor, where the police found her. The evidence also reveals that Betty was shot with a gun owned by defendant and kept in the nightstand near his side of the bed; that the gun was found to be completely devoid of fingerprints or smudges; that four bullets had been fired from the gun and were found in locations which render highly unlikely the possibility that Betty had fired them while aiming the gun at her head; that Betty, although she had for many years been disabled by the loss of a finger from her left hand and was

shown to have seldom used that hand, was shot in the left temple; that defendant, a gun enthusiast and an experienced marksman, claimed to be unable to distinguish between the sound of an explosion and that of a gunshot and claimed to have allowed his wife to fire a gun from their car into a cornfield; that Betty was shown to have had an aversion to guns and to have been inexperienced in their use; and finally, that Betty had been in an optimistic mood immediately prior to her death.

Defendant's theory that Betty killed herself is not supported by this evidence. In *Garrett*, the evidence was equally consistent with murder or suicide, and our supreme court found that the defendant had not been proved guilty to a reasonable and moral certainty. In the instant case, however, the evidence is much more consistent with murder than with suicide. We therefore find that no reasonable hypothesis of innocence existed and that the trial court properly found that the evidence in the instant case established defendant's guilt to a reasonable and moral certainty.

The decision of the circuit court is affirmed.

Affirmed.

HARTMAN and PERLIN, JJ., concur.