THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CESAR MUNOZ, Defendant-Appellant.

First District (1st Division)    No. 1—02—3026

Opinion filed May 3, 2004.—Rehearing denied June 4, 2004.

Thomas Peters and William P. Murphy, both of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, John E. Nowak, and Matthew Connors, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GORDON delivered the opinion of the court:

Following a jury trial, defendant Cesar Munoz was convicted of first-degree murder of his common law wife and sentenced to 45 years in prison. On appeal, defendant contends that: (1) the trial court's *in limine* ruling barring evidence of the wife's suicidal ideation violated his constitutional rights and, because that error was not harmless, his conviction must be reversed; (2) the trial court committed reversible error by allowing the State's pathologist to invade the province of the jury by stating her opinion beyond a reasonable doubt; (3) the trial court committed a prejudicial constitutional error when it prohibited cross-examination of the State's expert witness on matters that directly affected the reliability of that witness's expert opinion; and (4) his sentence is excessive. For the reasons stated below, we reverse the judgment of the trial court.

## BACKGROUND

On September 8, 1997, defendant's common law wife, Magdaliz Rosario (Magdaliz), was found dead in their apartment of a gunshot wound to the head. Defendant was charged with her murder. This case was tried twice. It first proceeded to trial on May 3, 2000, with the State maintaining that the manner of Magdaliz's death was a homicide, while defendant maintained that it was a suicide. The first jury to hear the case was unable to reach a verdict, so a mistrial was declared on May 7, 2000. A second trial commenced on November 2, 2000, and defendant was again tried by a jury. This time, the jury returned a verdict finding defendant guilty of first-degree murder. The trial judge sentenced defendant to 45 years in prison.

The following facts were adduced at the second trial. Defendant's friend, John Flores,[1] testified that he was living with defendant and Magdaliz in their apartment in Chicago. Flores and Magdaliz were having an affair which they hid from defendant. On September 8,

---

[1]Flores was in custody in Indiana when defendant's trial took place. He denied that he made a deal with the Illinois prosecutors in exchange for his testimony in defendant's trial.

1997, Flores took Magdaliz to a job interview at Luna Security, where he was employed. While Flores was waiting for Magdaliz outside the Luna Security office, defendant pulled up in a car and asked where Magdaliz was. Flores told defendant that Magdaliz was inside filling out an employment application. Defendant waited for Magdaliz, and approximately 20 to 25 minutes later, she left her interview and drove back to the apartment with defendant. According to Flores, Magdaliz was happy that she got a job at Luna Security.

Flores drove back alone in his car and arrived at their apartment building before defendant and Magdaliz. Flores briefly spoke to a friend he saw outside the apartment building and then he and his friend left to purchase cigarettes. Before he left, Flores saw defendant and Magdaliz enter the apartment building, apparently on their way to their second-floor apartment. Defendant did not appear to be angry when Flores saw him enter the apartment building with Magdaliz.

Chicago police officer Norbert Rivera testified that he responded to a call of a shooting, arrived at the apartment building in question and proceeded to the second-floor apartment. Officer Rivera made his way to the top of the stairs and saw a number of people in the hallway. Magdaliz was lying on the floor with a large amount of blood around her. Officer Rivera then asked where her husband was, and defendant's cousin, John Barrios, took Officer Rivera across the street to Barrios' apartment. There, Officer Rivera saw defendant, whom Barrios identified as Magdaliz's boyfriend or husband.

Officer Rivera asked defendant what had happened. Defendant told him that he got into a fight with his wife and she ran into their bedroom, closed the door, and then he heard a shot. Defendant further told Officer Rivera that he forced the door open, entered the bedroom, and attempted to take Magdaliz out of the apartment to get her medical assistance. Defendant then called 911. Officer Rivera next asked defendant where the gun was. He repeated that question several times before defendant responded. Defendant stated that he threw the gun into a garbage can. Officer Rivera and defendant left Barrios' apartment and went to the alley behind defendant's apartment building where the garbage cans were located. Defendant pointed out the garbage can containing the gun and moved the top bag of garbage out of the way so that Officer Rivera could see the gun, which was underneath the top bag of garbage and approximately a foot or a foot and a half down in the can. Officer Rivera left the gun there and told other officers at the scene to wait for evidence technicians. Defendant was arrested and transported to Area 5 police headquarters.

Chicago police department evidence technician (ET) Robert Davie testified that he arrived at the apartment building in question and

was directed to the garbage cans located in the alley next to the building. ET Davie photographed the gun and took it out of the garbage can. He then went to defendant's apartment to photograph the crime scene. Upon arriving at the apartment, ET Davie saw Magdaliz lying facedown in the exterior hallway. In the living room, there was a trail of blood on the floor and what looked like drag marks leading from the bedroom through the living room into the hallway. ET Davie also observed a large amount of blood on the mattress in the bedroom.

Chicago police department detective (Det.) Edwin Dickinson testified that he interrogated defendant at Area 5 police headquarters. According to Det. Dickinson, defendant admitted that he was jealous of Flores and, in his anger, made a mess of the apartment before leaving for Luna Security. Defendant also admitted to picking up Magdaliz from Luna Security. On the way home, defendant gave Magdaliz a driving lesson and allowed her to drive. Defendant stated that once at home, they put two of their three children to bed for a nap and defendant started to prepare a bath for their other child. It was then that Magdaliz ran into their bedroom and locked the door behind herself. Defendant told Det. Dickinson that he went to the door and tried to open it using a nail. At that point, defendant heard a gunshot and he broke the door down. He saw Magdaliz on the bed, propped up against the wall, bleeding from her face, holding a gun in her hand. Defendant got on the bed, took the gun away from Magdaliz and began to drag her toward the stairs. Defendant told Det. Dickinson that he tossed the gun out of the window. When defendant got to the top of the stairs, he screamed for help. Defendant's family lived next door, and his father and brother came to the apartment. Defendant then sent his brother to call the police, as there was no phone in the apartment.

Det. Robert Rutherford testified that he interrogated defendant after Det. Dickinson completed his interrogation. Defendant recounted a similar version of events to Det. Rutherford. Det. Rutherford, who had been to the crime scene prior to interviewing defendant, told defendant that he did not believe him and confronted defendant with the fact that neither the door nor the doorframe of the bedroom was damaged, and the gun was lying in the garbage can. Det. Rutherford then left the interview room. He later returned and spoke with defendant again. This time, defendant told Det. Rutherford that he had used a nail to unlock the door and that he did not toss the gun out of the window—rather, he walked over to the window, looked out and dropped the gun into the garbage can.

Later, defendant was interrogated again. According to Det. Rutherford, at defendant's request, a Spanish-speaking detective, Det.

Renaldo Guevara, joined Det. Rutherford.[2] This time, defendant told the detectives that, as he was putting one of their children to bed, he could see Magdaliz in their bedroom holding a gun up in the air. Defendant kept this gun in the dresser drawer. Defendant stated that he asked Magdaliz what she was doing, and she replied, "You don't have to worry about it." Defendant stated that he then went into the bedroom and began to wrestle with Magdaliz over the gun. The gun was cocked. As they were struggling over the gun, defendant twisted Magdaliz's arm, and the gun ended up pointing at her face when it went off.

At trial, the parties stipulated that both the gun recovered by ET Davie and one bullet, recovered from Magdaliz's head by medical examiner Dr. Nancy Jones, were sent to the Illinois State Police Forensic Crime Lab. The trial court then found Joseph Thibault, who works for the Illinois State Police Forensic Crime Lab, to be an expert in the field of firearms examination. Thibault testified that after comparing and testing the two items, he concluded that the gun recovered from the garbage can outside the apartment building fired the bullet recovered from Magdaliz's head. A fingerprint expert, Cynthia Engelking-Prus, testified that there were no prints on the gun that were suitable for comparison. A forensic scientist, Robert Berk, testified that Magdaliz's left hand tested positive for gunshot residue. He also testified that the gunshot residue tests performed on defendant were inconclusive.

Dr. Nancy Jones of the Cook County medical examiner's office (Medical Examiner's Office) was accepted by the trial court as an expert witness in the field of forensic pathology. Dr. Jones testified that she performed an autopsy on Magdaliz on September 9, 1997. During the autopsy, Dr. Jones observed that Magdaliz's wound showed evidence of a near contact range fire—there was a charred or burned abrasion around the wound caused by hot gasses that came out of the barrel of the gun at the same time the bullet did, burning the skin, and there was gunpowder present around the wound. Dr. Jones stated that the bullet entered through the lip, and followed an upwards, slightly left to right trajectory. Dr. Jones stated her opinion that the cause of death was a gunshot wound to the face.

Regarding the manner of death, Dr. Jones stated that it is determined on the basis of the circumstances surrounding the death, as well as the autopsy findings. Dr. Jones testified that in making her

[2]Det. Rutherford stated that at no point prior to this interview did defendant ever state that he had difficulty understanding the detectives or their questions.

determination as to the manner of Magdaliz's death, she considered the information she received in a written report from an investigator from the Medical Examiner's Office, photographs of the scene, the location and the appearance of the gunshot wound of entry, information that she was given by the Chicago police department concerning the circumstances of death, as well as her experience and expertise in dealing with cases of that sort. Dr. Jones stated several times her opinion that, to a reasonable degree of forensic, medical and scientific certainty, the manner of death was homicide. Dr. Jones stated that, although the wound was close contact range, the location and appearance of the wound were not indicative of suicide. Dr. Jones also found it significant that the gun was moved, and there was evidence that Magdaliz was dragged face downward, with a large portion of her body dragging along the floor. On redirect examination of Dr. Jones, the following colloquy took place:

"[QUESTION:] If you have any reasonable doubt as to whether a case is a homicide or a suicide—if you have any reasonable doubt as to if a case is a homicide, do you rule it a homicide?

[DEFENSE:] Objection.

THE COURT: You can answer.

[DR. JONES:] No, I do not."

The defense subsequently moved for a mistrial. That motion was denied. The State rested after Dr. Jones testified.

Defendant's brother, Nicky Munoz (Nicky), testified that he and defendant's parents lived in a house next to the building where defendant and Magdaliz lived. On the day Magdaliz died, Nicky loaned defendant his car. Nicky was at home when Magdaliz knocked on his door and returned his car keys. According to Nicky, she did not appear upset. At the same time, Nicky briefly observed defendant stand in front of his apartment building. Defendant did not seem upset or angry. Approximately 20 minutes later, Nicky heard defendant scream, "Help me. Help me. Maggie shot herself. She shot herself. Help me." Nicky immediately ran to defendant's apartment. When he arrived, he saw Magdaliz lying on the floor at the top of the stairs and defendant standing nearby "like frozen." Nicky ran back to his home and called 911.

Defendant's father, Cesar Munoz, Sr. (Cesar), testified that he also heard defendant screaming for help, and he too ran to the apartment. Cesar saw Magdaliz lying on the floor at the top of the stairs, and he then ran back to his home to call 911. Nicky was already on the phone with the 911 operator. Cesar took the phone from Nicky and told the operator to send an ambulance.

Defendant's cousin, John Barrios, testified that he lived across the street from defendant and Magdaliz. Barrios heard loud screaming

coming from defendant's apartment and ran up the stairs to see what was wrong. He saw Magdaliz lying on the floor at the top of the stairs and defendant standing near her saying that she shot herself. Barrios told defendant to come with him to his apartment, but defendant, at first, did not want to leave. Eventually, defendant agreed to leave with Barrios. Barrios saw the police arrive and led one of the officers to defendant. Another neighbor, Ricardo Torres, testified that he saw Barrios pulling defendant toward Barrios' apartment. Torres asked them what was wrong, and defendant responded, "Maggie shot herself."

Defendant testified as follows. He met Magdaliz in 1994 and they started living together in 1995. She already had one child by another man and, over the next two years, they had two more children together. At some point in 1997, Flores moved in with them. On September 7, 1997, one day before the incident, Magdaliz informed defendant that she wanted to apply for a job at Luna Security. Defendant told Magdaliz that he did not want her to work at Luna Security because she might get hurt. They agreed that Magdaliz would take the children to their baby-sitter's house prior to going to the interview. Instead, Magdaliz left the children at home with defendant. Defendant became angry at Magdaliz for leaving the children with him, so he borrowed his brother Nicky's car and drove himself and the children to Luna Security.

Defendant saw Flores outside the Luna Security office and asked him where Magdaliz was. Flores told him that she was inside applying for a job. Defendant told Flores that he needed Flores and Magdaliz to come back to the apartment because he thought that someone from the DCFS (Department of Children and Family Services) might be coming, and the apartment needed to be cleaned. Magdaliz soon came outside and drove home with defendant and their children. Flores left in his own car. Defendant gave Magdaliz a driving lesson on the way home and allowed her to drive. She then parked the car and took the car keys back to defendant's brother Nicky. Defendant saw Flores and his friend and briefly spoke to them before returning to the apartment with Magdaliz and their children.

Once inside the apartment, Magdaliz went into the bedroom. She started crying and defendant asked her if she was okay. Then Magdaliz went into the bathroom and began to prepare a bath for one of their children. Defendant took another child into the children's bedroom to put her to bed for a nap. A short while later, defendant heard a door slam. He went to check on Magdaliz and discovered that their bedroom door was locked. Defendant grabbed a nail and tried to open the door with it. Through the crack in the door, he could see

Magdaliz walking toward the dresser. He heard the drawer open and close. Magdaliz walked back, away from the dresser. Then defendant heard a pop sound of a gunshot, and he burst through the door.

Defendant saw Magdaliz sitting on the bed; blood was coming out of her mouth. The gun was on the bed. Defendant screamed for help. He grabbed Magdaliz and pulled her off the bed. Defendant then proceeded to pull Magdaliz toward the front door of the apartment. When he got to the top of the stairs, he saw his father and brother. Defendant told them that Magdaliz had shot herself. After defendant laid Magdaliz down on the floor, his father yelled, "Where is the gun?" Defendant ran to the bedroom, picked up the gun and threw it out of the window. He then ran back to Magdaliz. John Barrios pulled defendant away from Magdaliz and took him across the street to Barrios' apartment. Within a few minutes, police came to Barrios' apartment. Defendant spoke to Officer Rivera, told him what had happened and showed him where the gun was.

Defendant admitted to speaking with Det. Dickinson and Det. Rutherford at the police station. However, he denied telling them that he argued or fought with Magdaliz on the day of the incident. He also stated that he told the detectives that he did not mean to say in his earlier account that he literally broke the door down; rather, he meant to say that he tried to open it with a nail. Defendant recalled speaking with Det. Guevara in English and stated that he does not speak Spanish fluently. Defendant also stated that he recalled having a conversation with the detectives regarding the distinction between manslaughter and murder; following that conversation, he told the detectives there was a struggle between him and Magdaliz, even though there was none. On cross-examination, defendant denied that he told Det. Dickinson that he was angry or jealous of Magdaliz going to the job interview with Flores. He also denied that he told Det. Dickinson that he threw things around the bedroom in anger and made a mess.

At both trials, the defense's theory of the case was that Magdaliz had committed suicide. Before each of the two trials, the State made a motion *in limine* to bar testimony that related to statements allegedly made by Magdaliz regarding her suicidal state of mind. Defense counsel, however, argued that he was entitled to present evidence of Magdaliz's suicidal ideation. Defense counsel sought to introduce testimony of Elizabeth Constable, one of Magdaliz's friends, as well as her mother, Nancy Constable. Defense counsel stated that he expected their testimony to show that about a month before Magdaliz died, she told Elizabeth that she felt like killing herself, and, approximately one week before her death, Magdaliz indicated to Elizabeth that she was making herself vomit to lose weight and stated that she did not care if

she lived or died. Elizabeth, who was 16 years old at that time, spoke to her mother, Nancy, about these conversations with Magdaliz and repeated the conversations to her. Nancy Constable otherwise had no independent knowledge of Magdaliz's statements. The defense also sought to introduce testimony of Carol Gonzales, who would state that, in 1993, Magdaliz told her that she had previously attempted suicide.

The State's position was that the proffered hearsay statements were inadmissible under *Siebert v. People*, 143 Ill. 571, 32 N.E. 431 (1892), which has never been expressly overruled. *Siebert* held that a statement as to a decedent's intent to commit suicide is inadmissible unless combined with evidence of a contemporaneous act of the decedent that such statement might characterize or explain. *Siebert*, 143 Ill. at 588, 32 N.E. at 435. The only evidence of a contemporaneous act that the defense could offer was the proffered testimony of Carol Gonzales that some four years prior to making the statements regarding suicide to Elizabeth, Magdaliz told Carol Gonzales that she had previously attempted suicide.

Defense counsel maintained that he was entitled to present evidence of Magdaliz's state of mind prior to her death. The defense had also obtained affidavits of Elizabeth and Nancy Constable. These affidavits, like the Constables' proffered testimony, related Magdaliz's statements about suicide. Specifically, the affidavit of Elizabeth Constable states that in the summer of 1997, Magdaliz told her that she did not care if she lived or died and indicated that she was making herself vomit by putting her finger down her throat. Elizabeth's affidavit further states that about a week before she died, Magdaliz again stated that she did not care if she lived or died. Nancy's affidavit restates Magdaliz's declarations as they were related to Nancy by Elizabeth. The trial court found *Siebert* controlling. The court further found that the proffered evidence was insufficient to meet the requirements of *Siebert* and barred defense witnesses from testifying to Magdaliz making statements related to contemplation of suicide.

Defense counsel also intended to offer the testimony of Dr. James Bryant, an expert pathologist, who would consider these affidavits, as well as the affidavit of Carol Gonzales,[3] and render an opinion as to the manner of Magdaliz's death. The defense expected Dr. Bryant to

---

[3]As discussed below, it appears from the record that the defense had abandoned the idea of using the statements of Carol Gonzales. Defense counsel only proffered the affidavits of Elizabeth and Nancy Constable. The record does not contain an affidavit from Carol Gonzales. Moreover, the State's motion *in limine* to bar the testimony of Dr. Bryant made no reference to an af-

testify that, based on his review of all the relevant forensic material and the statements of Elizabeth Constable and Carol Gonzalez, the manner of death could have been suicide, rather than homicide. The defense planned to use Dr. Bryant's opinion to counter the opinion of the State's expert pathologist, Dr. Jones, who had concluded that the manner of death was homicide. The State made a motion *in limine* seeking to bar the testimony of Dr. Bryant regarding the affidavits of the Constables and to bar Dr. Bryant from testifying as an expert in forensic pathology. The trial court did not bar Dr. Bryant from testifying as an expert. However, the court prohibited Dr. Bryant from referring to the affidavits of the Constables at trial to explain the basis of his opinion. Likewise, the court prohibited defense counsel from using these affidavits while cross-examining the State's expert, Dr. Jones. Ultimately, Dr. Bryant did not testify at trial.

The second jury returned a verdict of guilty on the charge of first-degree murder. The trial judge denied defendant's two motions for a new trial, a motion to reconsider sentence, and a motion to reduce sentence. Defendant now appeals.

## ANALYSIS

On appeal, defendant contends that (1) the trial court's ruling barring evidence of Magdaliz's state of mind prior to her death violated defendant's constitutional rights and, because that error was not harmless, his conviction must be reversed; (2) the trial court committed reversible error by allowing the State's pathologist to invade the province of the jury by stating her opinion beyond a reasonable doubt; (3) the trial court committed a prejudicial constitutional error when it prohibited cross-examination of the State's expert witness on matters that directly affected the reliability of that witness' expert opinion; and (4) his sentence is excessive.

Defendant first contends that Elizabeth Constable and Carol Gonzales should have been allowed to testify about Magdaliz's suicidal statements. Defendant urges that the trial court's ruling barring this evidence violated his fundamental constitutional right to present relevant exculpatory evidence, and his conviction should be reversed because the jury was unaware of Magdaliz's suicidal ideation. The State, on the other hand, contends that the trial court properly excluded defendant's proffered evidence regarding Magdaliz's state of mind before her death because that evidence was inadmissible hearsay.

█ It is undisputed that "[s]tatements that indicate the declarant's state of mind are admissible as exceptions to the hearsay rule when

---

fidavit from Gonzales, and no mention of Gonzales' statements was made during the argument of the motion *in limine*.

the declarant is unavailable to testify, there is a reasonable probability that the proffered hearsay statements are truthful, and the statements are relevant to a material issue in the case." *People v. Caffey*, 205 Ill. 2d 52, 91, 792 N.E.2d 1163, 1189 (2001).

Defendant argues that the state-of-mind exception applies with equal force to statements evidencing a suicidal disposition or intent as it does to all other statements and, therefore, the trial court committed reversible error by excluding Magdaliz's statements concerning contemplation of suicide. In support, defendant relies on *City of Streator v. Industrial Comm'n*, 92 Ill. 2d 353, 365, 442 N.E.2d 497, 503 (1982), where the court upheld the admissibility into evidence, under the state-of-mind exception to the hearsay rule, of a suicide note stating that the decedent's work-related injury was the cause of his suicide; *People v. Coleman*, 328 Ill. App. 3d 688, 692, 767 N.E.2d 388, 392 (2002), *vacated on other grounds*, 206 Ill. 2d 623, 799 N.E.2d 677 (2003), where the court upheld the admissibility of the decedent's out-of-court statements regarding her plan to divorce the defendant—both to establish her state of mind and to suggest the defendant's motive for killing her[4]; *People v. Ross*, 132 Ill. App. 3d 498, 503, 477 N.E.2d 1258, 1262-63 (1985), where the court upheld the admissibility of letters written by the decedent shortly before her death and offered to counter the defendant's contention that the decedent committed suicide, by showing the decedent's optimistic state of mind; and *United States v. Vetlmann*, 6 F.3d 1483, 1494-95 (11th Cir. 1993), where the court held that the exclusion of evidence of the decedent's suicide threats and references to dying was reversible error.

As noted, the State relies on the 1892 decision of our supreme court in *Siebert*, which held that hearsay declarations relating to the contemplation of suicide are generally inadmissible, unless they are part of the *"res gestae,"* a contemporaneous act of the decedent that such statements might characterize or explain. *Siebert*, 143 Ill. at 588, 32 N.E. at 435. *Siebert* was followed by our supreme court during the early part of the twentieth century in *Nordgren v. People*, 211 Ill. 425, 71 N.E. 1042 (1904), and *Greenacre v. Filby*, 276 Ill. 294, 114 N.E. 536 (1916). While defendant does not, in his brief, offer any discussion of *Siebert* and its progeny, he implicitly contends that the state-of-mind exception, including suicidal state of mind, has generally evolved to allow admissibility without regard to the doctrine of *res gestae* (see Fed. R. Evid. 803), and *Siebert*'s proscriptions have been ultimately

---

[4]On remand, the court engaged in the same analysis of the admissibility of the "state-of-mind" statements of the decedent. See *People v. Coleman*, 347 Ill. App. 3d 266 (2004).

abandoned by our supreme court. For the reasons that follow, we agree.

The question regarding the admissibility of a decedent's statements evidencing a suicidal disposition was first addressed in *Jumpertz v. People*, 21 Ill. 461 (1859), where the court, without referring to the *res gestae* requirement, stated that evidence of a decedent's state of mind showing her predisposition to commit suicide was generally admissible. However, *Siebert* and its progeny, without referring to *Jumpertz*, held otherwise and required that suicidal declarations of the decedent be accompanied by a contemporaneous related act, or *res gestae*. *Siebert* itself was chiefly based on the authority of *Commonwealth v. Felch*, 132 Mass. 22 (1882). Notably, as Wigmore points out, *Felch* was overruled by *Commonwealth v. Trefethen*, 157 Mass. 180, 31 N.E. 961 (1892), some two weeks before the *Siebert* ruling "and was of course then unreported and unknown to the Illinois court; the latter, in the official report and in the bound volume of the Northeastern Reporter, inserted in the opinion a reference to the *Trefethen* case; but it is fair to suppose that, had the *Trefethen* case been originally before them, they might have decided differently." 6 J. Wigmore, Evidence § 1726, at 139 n.4 (Chadbourn rev. ed. 1976).

Over the years, the *res gestae* doctrine has been strongly criticized and repudiated by leading legal authorities. As Wigmore has stated:

> "The phrase 'res gestae' has long been not only entirely useless, but even positively harmful. It is useless, because every rule of Evidence to which it has ever been applied exists as a part of some other well-established principle and can be explained in the terms of that principle. It is harmful, because by its ambiguity it invites the confusion of one rule with another and thus creates uncertainty as to the limitations of both." 6 J. Wigmore, Evidence § 1767, at 182 (3d ed. 1940).

Specifically, regarding the use of the *res gestae* doctrine in conjunction with the state of mind exception to the hearsay rule, Wigmore has long disapproved of the court decisions that require a related act to accompany a declaration because this rule "would not necessarily contribute to the trustworthiness of the assertion (which is the real objective), it can be only an arbitrary limitation." 6 J. Wigmore, Evidence § 1768, at 184 (3d ed. 1940).

Our supreme court expressed the same conclusion in *People v. Poland*, 22 Ill. 2d 175, 180, 174 N.E.2d 804, 806 (1961):

> "We see no useful purpose to be served in dealing with the problem by using the term '*res gestae*.' That amorphous concept has been applied indiscriminately to a multitude of situations, some of which contain no element of hearsay at all, while others involve true exceptions to the hearsay rule. As applied to the situa-

tion involved here, we think that the term 'res gestae' not only fails to contribute to an understanding of the problem but may actually inhibit any reasonable analysis."

This rejection of the *res gestae* doctrine was extended by our scholars and courts to declarations of suicidal state of mind, as well. By the middle of the twentieth century, many jurisdictions, in agreement with Wigmore's view, held that in prosecutions for homicide, where suicide of the decedent is relied on as a defense, his or her declarations or threats indicating a suicidal disposition, but not relating to actual attempts, are generally admissible for the purpose of showing the decedent's state of mind and as tending to support the theory of suicide, at least if the circumstances are as suggestive of suicide as of homicide, and the declarations were uttered within a reasonable time before death. See Annotation, *Admissibility in Prosecution for Homicide of Declarations Indicating Suicidal Disposition on Part of Deceased*, 83 A.L.R. 434 (1933). As of this date, the overwhelming majority of jurisdictions agree that, as is the case with state-of-mind evidence generally, suicidal declarations unaccompanied by a related act are admissible. See 1A J. Wigmore, Evidence § 143, at 1740-42 n.1 (Tillers rev. 1983); see also, *e.g.*, *State v. Drach*, 268 Kan. 636, 640-41, 1 P.3d 864, 868-69 (2000); *Powell v. Commonwealth*, 554 S.W.2d 386, 390 (Ky. 1977); *State v. Davis*, 336 Or. 19, 26, 77 P.3d 1111, 1115 (2003).

The higher courts of Illinois have not specifically revisited *Siebert* and its progeny since the early 1900s with respect to the issue of admissibility of such declarations. However, in general, with respect to the state-of-mind exception to the hearsay rule, this court has long held that a person's state of mind "may be proved by testimony of contemporaneous oral declarations," and expressly rejected the requirement that the declarations be accompanied by a contemporaneous related act. *Quick v. Michigan Millers Mutual Insurance Co.*, 112 Ill. App. 2d 314, 320, 250 N.E.2d 819, 822 (1969). Similarly, in the context of the admissibility of excited utterances, our supreme court, as discussed above, has expressly disapproved of the *res gestae* requirement and now analyzes the issue by utilizing the three-factor test for the admissibility of excited utterances as set forth in the Wigmore and Cleary treatises. *Poland*, 22 Ill. 2d at 181, 174 N.E.2d at 807, citing 6 J. Wigmore, Evidence § 1950 (3d ed. 1940), and E. Cleary, Handbook of Illinois Evidence § 13.28 (1956).

It is against this backdrop, then, that we must view our supreme court's subsequent decision in *City of Streator*, addressing the admissibility of a note expressing a suicidal state of mind, where the court reiterated that "an individual's declarations as to his state of mind are

admissible to show that state of mind and such other things as proof of a state of mind tends to establish." *City of Streator*, 92 Ill. 2d at 365, 442 N.E.2d at 503. In *City of Streator*, a workmen's compensation case, at issue was whether the decedent's suicide arose out of and in the course of his employment. *City of Streator*, 92 Ill. 2d at 361, 442 N.E.2d at 501. The supreme court upheld the admissibility into evidence of a note apparently written by the decedent within one day of his death, expressing despondency over his health problems. *City of Streator*, 92 Ill. 2d at 360, 365, 442 N.E.2d at 500, 503. While the admissibility of that note was used to establish the cause of decedent's suicide, rather than the intent to commit suicide, the court did not hesitate to apply the general standards governing the state-of-mind exception to the hearsay rule without any discussion of or reference to the special proscriptions of *Siebert* and its progeny.

Likewise, the decision of our supreme court in *People v. Floyd*, 103 Ill. 2d 541, 546, 470 N.E.2d 293, 295 (1984), is consistent with the court's earlier decisions in *City of Streator* and *Poland*. In *Floyd*, the defendant was charged with the murder of his wife. *Floyd*, 103 Ill. 2d at 543, 470 N.E.2d at 294. The defendant raised a defense of accident (*Floyd*, 103 Ill. 2d at 545-46, 470 N.E.2d at 295), which is closely analogous to a defense of suicide for purposes of the admissibility of evidence regarding the decedent's state of mind (see, *e.g.*, *Stoll v. State*, 762 So. 2d 870, 874-75 (Fla. 2000); *United States v. Brown*, 490 F.2d 758, 766-67 (D.C. Cir. 1973), 2 J. Strong, McCormick on Evidence § 276 (5th ed. 1999)). The relevant issue in *Floyd* was the admissibility of the wife's statements concerning her fear of the defendant. *Floyd*, 103 Ill. 2d at 546, 470 N.E.2d at 295. Although it found that the specific statements proffered were inadmissible because they were irrelevant, the court held that, generally, evidence of the decedent's state of mind may be relevant when it serves to rebut the defense of accident, and the general principles applicable to the state-of-mind exception should be applied (without requiring a contemporaneous act). *Floyd*, 103 Ill. 2d at 546-47, 470 N.E.2d at 295.

Thus, the court held that the test for the admissibility of state-of-mind declarations should be: (1) the unavailability of the declarant to testify; (2) the reasonable probability that the proffered hearsay statements are truthful; and (3) the relevancy of the declarant's state of mind to a material issue in the case. *Floyd*, 103 Ill. 2d at 546, 470 N.E.2d at 295. Notably, *Floyd* gave no indication that a different standard may govern the admissibility of state-of-mind declarations offered by the prosecution to rebut a defense of accident or, for that matter, declarations offered by the defendant in support of the defense of suicide. Rather, *Floyd*, consistent with the earlier decisions in *City*

*of Streator* and *Poland,* did not impose a contemporaneous act requirement on the state-of-mind declarations. We note that, in that regard, *Floyd* is also consistent with Rule 803 of the Federal Rules of Evidence. See Fed. R. Evid. 803(3). It would, therefore, appear that our supreme court, in its current position, no longer seeks to apply the doctrine of *res gestae* to any state-of-mind declaration, including a suicidal state of mind. See *Caffey,* 205 Ill. 2d at 91-92, 792 N.E.2d at 1189 (reaffirming the approach taken in *Floyd).* Accordingly, we find that the trial court erred in its reliance on the *res gestae* doctrine under *Siebert.*

Although the trial court, in addition to excluding the statements under the *res gestae* requirement of *Siebert,* also appears to have challenged the reliability of Magdaliz's suicidal declarations, particularly in their use in affidavits proffered to support the opinion of the defense's expert, we find that challenge to be unwarranted. In that respect, we note that the court did not purport to analyze the declarations under the *Floyd* test, in that the court did not subject them to the analysis of whether there is a reasonable probability that the declarations were truthful. To the contrary, we find that the proffered testimony of Elizabeth Constable as to Magdaliz's statements suggesting her suicidal disposition meets the criteria of *Floyd* because Magdaliz was unavailable to testify, there is a reasonable probability that the statements she made in close proximity to the time of her death to Elizabeth, a close and trusted friend, were truthful, and the statements were relevant to a material issue in the case, namely, whether the manner of Magdaliz's death was suicide or homicide. We further note that neither during the argument of the motion *in limine* nor in its brief before this court did the State make a showing that Magdaliz's statements are unfairly prejudicial to the prosecution. Therefore, there is no reason to preclude the jury from hearing this evidence.

■ While, generally, the applicable standard of review for evidentiary rulings by the trial court is abuse of discretion (*Caffey,* 205 Ill. 2d at 89, 792 N.E.2d at 1188), where the ruling is not based on live testimony and the credibility of the witnesses is not premised upon the court's observation of demeanor but, rather, the ruling is exclusively based upon the submission of documents, *de novo* review is appropriate (see *People v. Mitchell,* 165 Ill. 2d 211, 230, 650 N.E.2d 1014, 1023 (1995) (if neither the facts nor the credibility of witnesses is questioned, *de novo* review is appropriate)). Moreover, the review is *de novo* where " 'a trial court's exercise of discretion has been frustrated by an erroneous rule of law.' " *Caffey,* 205 Ill. 2d at 89, 792 N.E.2d at 1188, quoting *People v. Williams,* 188 Ill. 2d 365, 369, 721 N.E.2d 539, 542 (1999). In the instant case, the trial court based its ruling on relevant documents which it considered in conjunction with

the parties' arguments and did not assess the credibility of witnesses. In addition, the trial court based its ruling on an erroneous rule of law. Therefore, our review of the trial court's ruling to exclude Magdaliz's statements is *de novo.*

■ Accordingly, for the reasons stated, we find on *de novo* review that the evidence at issue is reliable. Moreover, its reliability is such that even if the standard of review was abuse of discretion, it would be difficult to support the judge's discretion to exclude this evidence. In sum, we find that the trial court erred in barring the testimony of Elizabeth Constable regarding Magdaliz's statements evidencing her despondent state of mind.

However, while we disagree with the trial court with respect to the admissibility of the testimony of Elizabeth Constable, we agree that the testimonies of Nancy Constable and Carol Gonzales on this issue were properly excluded as inadmissible hearsay. As previously stated, Nancy Constable had no personal knowledge of Magdaliz's statements. Thus, Nancy's testimony regarding Magdaliz's statements would have to overcome a double hearsay impediment, namely, what the declarant (Magdaliz) told the witness (Elizabeth) and the witness related to another (Nancy). It is the second layer of hearsay, relating of the statements by Elizabeth to Nancy, that is not within any exception to the hearsay rule. Similarly inadmissible is the testimony of Carol Gonzales as to the content of the statement Magdaliz allegedly made to Gonzales to the effect that Magdaliz had previously attempted suicide. This is an historical statement rather than a contemporaneous state-of-mind declaration; nor does it fall within any other hearsay exception.

Considering that the evidence at the second trial was closely balanced,[5] as evidenced by the fact that the first jury to hear the case was unable to reach a verdict, the State cannot meet its burden of establishing that the error in excluding Elizabeth Constable's testimony was harmless. Moreover, as discussed in more detail below, if it was an error to exclude the testimony of Elizabeth Constable then, *a fortiori*, it was equally erroneous to preclude the defense's expert from relying on or referring at trial to that testimony (or the affidavit of Elizabeth Constable containing the substance of that testimony).

---

[5]As previously stated, there were no eyewitnesses to the shooting, no prints on the gun suitable for comparison, Magdaliz's left hand tested positive for gunshot residue, the gunshot residue tests performed on defendant were inconclusive, and Magdaliz's wound was close contact range, indicating the possibility that it was self-inflicted.

■ Defendant's conviction is also reversible on the following independent ground. As previously noted, at the second trial the State's expert, Dr. Jones, was permitted over the defense's objection to testify that, in forming her opinion as to the manner of death, she utilized a reasonable doubt standard, and if she had any reasonable doubt that the manner of Magdaliz's death was homicide she would not have rendered her opinion to that effect. Defendant contends that in stating her opinion beyond a reasonable doubt, Dr. Jones became an advocate for the prosecution and infringed on the jury's duties. Defendant further contends that in permitting Dr. Jones to testify in this manner, the trial court committed reversible error. During the first trial, Dr. Jones properly stated her opinion within a reasonable degree of medical and scientific certainty. Defendant argues that because the jury did not convict him at that time, it is clear that it was Dr. Jones' improper testimony in the second trial that tipped the balance in favor of the State.

The State responds that defendant gives undue weight to one admission and takes it out of the context of the rest of the proceedings. The State points out that on direct examination, Dr. Jones stated her opinion on the manner of death "to a reasonable degree of forensic, medical and scientific certainty." Similarly, on cross-examination, Dr. Jones stated she reached her opinion to a reasonable degree of forensic, medical and scientific certainty. Finally, on re-cross-examination, Dr. Jones concluded that she determined the manner of death based on reasonable degree of forensic, medical and scientific certainty. The State contends that, in the overall context of the proceedings, Dr. Jones' answer in the negative to the State's question on redirect examination, as to whether she rules a death a homicide if she has any reasonable doubt on that matter, is to be interpreted to mean that Dr. Jones is very careful in making such manner of death determinations and she is confident in her own work. According to the State, Dr. Jones was merely informing the jury of the nature of her opinion and, in doing so, she did not dictate the outcome of the trial. The State thus argues that defendant overstates the importance of the challenged statement which, it contends, "was both proper and invited by defense counsel," and the trial court did not abuse its discretion in permitting Dr. Jones to testify in the way she did.

Defendant relies on *LID Associates v. Dolan*, 324 Ill. App. 3d 1047, 756 N.E.2d 866 (2001), for the proposition that although an expert is allowed to offer an opinion on the ultimate issue in the case, an expert is not allowed to offer legal conclusions that infringe on the jury's duties. *LID Associates*, 324 Ill. App. 3d at 1058, 756 N.E.2d at 876-77 (finding that the trial court abused its discretion in allowing expert

witnesses to express legal conclusions, which differed from the trial court's instructions to the jury, on the issue of breach of fiduciary duty), citing *Sohaey v. Van Cura*, 240 Ill. App. 3d 266, 283-84, 607 N.E.2d 253, 267 (1992) (upholding the exclusion of proffered testimony of the plaintiff's expert as to the standard of care for real estate brokers and whether the defendants breached that standard of care). Although both *LID Associates* and *Sohaey* address expert testimony presented in civil cases with respect to legal standards governing the transactions at issue, and not expert forensic testimony in a criminal case, they are instructive on the issue at hand. In *Sohaey*, this court stated:

> "It may be prejudicial error to allow an expert witness to testify *** with respect to a key legal term in a case *if the jury might look to the expert witness for legal guidance on the matter* rather than the court." (Emphasis added.) *Sohaey*, 240 Ill. App. 3d at 283, 607 N.E.2d at 267.

In the instant case, Dr. Jones was allowed to state her opinion on the ultimate issue in the case, namely, whether the manner of death was homicide, beyond a reasonable doubt. It is likely that, as a result, the jury was improperly influenced to conclude, beyond a reasonable doubt, that the manner of death was homicide and, therefore, defendant was guilty. Accordingly, we find that the trial court abused its discretion in allowing this testimony. As previously stated, in light of the fact that the evidence was closely balanced and the first jury to hear the case was unable to reach a verdict, the State cannot meet its burden of establishing that this error was harmless. For the reasons stated above, the matter must be remanded for a new trial.

■ On remand, since we have held that the testimony of Elizabeth Constable is admissible to show Magdaliz's state of mind, then it is clear that the defense's expert, in reaching his opinion as to the manner of Magdaliz's death, may rely on Elizabeth's testimony and her affidavit outlining what her testimony would be. There is no question that an expert may rely on in-court testimony. Moreover, neither party would dispute that, in the absence of in-court testimony, the defense's expert may also rely on the affidavits of both Constables, although the proffered testimony of Nancy Constable is not independently inadmissible because of a double hearsay problem previously discussed.

Both defendant and the State agree that expert testimony is governed by our supreme court's decision in *People v. Anderson*, 113 Ill. 2d 1, 495 N.E.2d 485 (1986). *Anderson* reaffirmed the holdings of *People v. Ward*, 61 Ill. 2d 559, 338 N.E.2d 171 (1975), and *Wilson v. Clark*, 84 Ill. 2d 186, 417 N.E.2d 1322 (1981), that an expert witness may utilize substantively inadmissible materials in forming his or her

opinion, so long as experts in the field reasonably rely on such materials (*Anderson*, 113 Ill. 2d at 7, 495 N.E.2d at 487), and answered in the affirmative the question of whether an expert witness may disclose the contents of otherwise inadmissible materials upon which he or she reasonably relied, in order to explain the basis of his or her opinion (*Anderson*, 113 Ill. 2d at 8-9, 495 N.E.2d at 488).

Accordingly, we note that even if the testimony of Elizabeth Constable were not independently admissible, and although the testimony of her mother Nancy is not, in fact, independently admissible, the defense's expert would not be precluded from relying on both of their affidavits,[6] if experts in the field of forensic pathology reasonably and customarily consider this type of information from a decedent's family members and friends when formulating an opinion on the manner of death. Defendant contends that such reliance is reasonable. In support, defendant alleges, without a challenge, that the head of the Medical Examiner's Office, Dr. Edmund Donoghue, is the co-author of a textbook on the medicolegal investigations of death, a leading text on forensic investigations. In it, the authors explicitly state that information about a decedent's state of mind is an essential component of any forensic investigation where suicide is a possible explanation, and such information is usually obtained from neighbors and friends. We further note that the State does not dispute this latter contention on appeal.

We observe that *Anderson*, *Wilson* and *Ward* did not address the issue of whether an expert may rely on an independently inadmissible affidavit of a layperson to aid him or her in forming an opinion. Rather, all of these cases addressed whether an expert may rely on the medical or psychological records compiled by others. As our supreme court explained:

> "If such reports are of a type customarily utilized by the medical profession, then these reports may be used as factors by an expert *** even though the reports are not admitted into evidence. The restriction that these materials be commonly used by the medical profession attributes a high degree of reliability to them." *Ward*, 61 Ill. 2d at 568, 338 N.E.2d at 177.

Nevertheless, we find that *Wilson* and *Ward* do provide us with necessary guidance. In *Wilson*, our supreme court adopted Rules 703 and 705 of the Federal Rules of Evidence to govern all cases involving expert testimony. *Wilson*, 84 Ill. 2d at 196, 417 N.E.2d at 1327. At that time, prior to being amended in 2000, Rule 703 provided:

---

[6]As previously stated, Nancy's affidavit merely relates Magdaliz's statements, as Elizabeth repeated them to her mother. It is consistent with the affidavit and the proffered testimony of Elizabeth.

> "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." Fed. R. Evid. 703.

Rule 705 remains unchanged and provides:

> "The expert may testify in terms of opinion or inference and give reasons therefor without first testifying to the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination." Fed. R. Evid. 705.

Moreover, in both *Wilson* and *Ward*, our supreme court looked for guidance to the advisory committee's note to Rule 703 to determine which facts or data an expert may rely upon in forming his or her opinion. The note provided then and remains unchanged today, in relevant part, that:

> "[One of the sources] contemplated by the rule consists of presentation of data to the expert outside of court and other than by his own perception. In this respect the rule is designed to broaden the basis for expert opinions beyond that current in many jurisdictions and to bring the judicial practice into line with the practice of the experts themselves when not in court. Thus a physician in his own practice bases his diagnosis on information from numerous sources and of considerable variety, including *statements by* patients and *relatives*, reports and opinions from nurses, technicians and other doctors, hospital records, and X rays." (Emphasis added.) Fed. R. Evid. 703, Advisory Committee's Note.

In light of the foregoing, we conclude that it is not unreasonable for a forensic pathologist to consider statements of a decedent's friends and relatives regarding the decedent's state of mind in conducting a forensic investigation where suicide is a possible explanation.

Since we hold that the testimony of Elizabeth Constable is admissible, there is no reason to preclude the defense's expert from disclosing the contents of Elizabeth's affidavit containing the substance of her testimony. See *Anderson*, 113 Ill. 2d at 9, 495 N.E.2d at 488 (the proponent of the expert has the right to elicit, even on direct examination, "the contents of materials upon which [the expert] reasonably relies in order to explain the basis of his opinion"). Where there is a possibility that a jury could misuse this type of information as substantive proof, a limiting instruction should be given. *Anderson*, 113 Ill. 2d at 12, 495 N.E.2d at 490. We note that *Anderson* also provides a caveat that "[a] trial judge *** need not allow the expert to recite secondhand information when its probative value in explaining the expert's opinion

pales beside its likely prejudicial impact or its tendency to create confusion." *Anderson*, 113 Ill. 2d at 12, 495 N.E.2d at 490. This qualification has greater cogency in the context, such as the one in *Anderson*, where the facts and data upon which the expert relies are not independently admissible. This qualification was expanded in the 2000 amendment to federal Rule 703, after *Wilson* and *Anderson* were decided, which added the following (last) sentence to the text of the rule:

> "Facts or data *that are otherwise inadmissible* shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect." (Emphasis added.) Fed. R. Evid. 703.

As the advisory committee's note to amended Rule 703 explains in pertinent part:

> "The amendment provides a presumption against disclosure to the jury of information used as the basis of an expert's opinion *and not admissible for any substantive purpose*, when that information is offered by the proponent of the expert." (Emphasis added.) Fed. R. Evid. 703, Advisory Committee's Note.

Because we have held that the testimony of Elizabeth Constable was independently admissible, the discretion of the trial judge to prohibit the disclosure of her affidavit must be, correspondingly, reevaluated. We recognize that the discretion of a trial judge to control the disclosure of the data comprising the basis of an expert's opinion and proffered by the expert's proponent has been significantly altered by the amended federal Rule 703. Nevertheless, even if the federal Rule 703, as amended in 2000, is applicable under our state practice, such discretion may not be exercised arbitrarily to blanketly characterize such data as unduly prejudicial where the data would otherwise assist the jury in its evaluation of the expert's opinion, particularly where the data could have been independently admitted through the direct testimony of the affiant. See generally, Fed. R. Evid. 703, Advisory Committee's Note, as noted above.

Because of our disposition of this case, we need not address defendant's other arguments on appeal. For the foregoing reasons, the judgment of the trial court is reversed, and the cause is remanded for a new trial.

Reversed and remanded.

O'MALLEY, P.J., and McNULTY, J., concur.