TODD W. MUSBURGER, LTD., Plaintiff-Appellee, v. GARRY MEIER, Defendant-Appellant.

First District (1st Division)   Nos. 1—07—3080, 1—08—0814 cons.

Opinion filed August 31, 2009.

GARCIA, J., specially concurring.

Walter P. Maksym, of Chicago, for appellant.

McGuireWoods LLP, of Chicago (Keith Dorman, Carlin R. Metzger, and Susan Groh, of counsel), for appellee.

PRESIDING JUSTICE ROBERT E. GORDON delivered the opinion of the court:

A jury returned a verdict in favor of plaintiff Todd W. Musburger, Ltd., a law firm, against defendant Garry Meier, awarding $68,750 in damages on count II of plaintiff's verified complaint for services rendered under a theory of *quantum meruit*.[1] On January 30, 2007, the trial court entered judgment on that verdict. Defendant appeals the denial of his posttrial motion and petition under section 2—1401 of the Code of Civil Procedure (735 ILCS 5/2—1401 (West 2006)) with respect to the January 30, 2007, order. On appeal, defendant raises five principal contentions arguing that: (1) the jury's verdict is against the manifest weight of the evidence, (2) the trial court erred by denying his motion to dismiss count II of plaintiff's complaint and by denying his motion for leave to file a fifth affirmative defense, (3) the trial court erred by barring certain expert testimony, (4) the trial court erred by barring defendant from presenting evidence of payment concerning his second affirmative defense, and (5) the January 30, 2007, order entering judgment on the jury's verdict should be vacated due to a misnomer of plaintiff law firm in the complaint. We affirm for the reasons set forth below.[2]

## BACKGROUND

### 1. The Parties

According to the complaint in the case at bar, plaintiff "is an entertainment law firm that focuses on negotiating and drafting personal services contracts for broadcasters, writers, performers and directors, as well as negotiating and drafting contracts for entertainment projects in development." Todd Musburger is the president of plaintiff law firm and has been licensed as an Illinois attorney since

---

[1] Counts I and III of plaintiff's verified complaint, alleging breach of contract and unjust enrichment, respectively, were dismissed by the trial court prior to trial and are not before this court.

[2] We note that defendant has not filed a reply brief with this court.

1973. Brian Musburger is Todd Musburger's son and is not an attorney and is employed by plaintiff law firm. Brian develops presentations, prepares industry analyses, keeps abreast of the media industry, and assists with negotiations between clients and their media employers, and has been employed with plaintiff law firm since 1998. Defendant is a well-known "on air radio personality who formerly cohosted the radio program commonly referred to as the 'Roe and Garry' show," on "WLS-AM radio" in Chicago from February 1996 to February 19, 2004.

## 2. The Events Leading to Trial

The complaint in the case at bar alleges that on or about sometime in January 1998, defendant orally requested plaintiff to "serve as [defendant's] agent and exclusive legal representative for the negotiating and drafting of [defendant's] multi-million dollar agreements with the entertainment fields of radio and television." On February 6, 1998, plaintiff and defendant entered into a written agreement (1998 Agreement) where plaintiff agreed "to provide its services as [defendant's] exclusive representative for negotiating and drafting of [defendant's] agreements in the entertainment fields of radio and television." The complaint further alleges that plaintiff also agreed to provide advice and counseling "as needed," and to use its best efforts to locate other broadcast outlets that would be interested in defendant's services. Under the 1998 Agreement, defendant agreed to pay "the sum of 5% of the gross amount of the contract negotiated by [p]laintiff on [defendant's] behalf," and all expenses incurred on behalf of defendant.

The complaint alleges that plaintiff began "intensive negotiations" with WLS regarding the renewal of defendant's already existing contract immediately upon execution of the 1998 Agreement. The complaint further alleges that "[a]fter months of rigorous negotiations," plaintiff successfully negotiated a five-year contract on behalf of defendant with WLS. The term of the written contract was from February 19, 1999, to February 18, 2004. Plaintiff received payment as fees in the amount of 5% of the gross amount of the contract.

The complaint further alleges that in September 2002, approximately 18 months prior to which defendant's contract with WLS was to expire in February 2004, defendant again retained plaintiff to negotiate a renewal contract. Plaintiff and defendant orally agreed that plaintiff would undertake this representation under the same terms as their 1998 Agreement; as before, plaintiff would receive 5% of the gross amount of the contract negotiated on behalf of defendant. The complaint further alleges that defendant "instructed [plaintiff] to

explore and investigate potential alternative deals with competing broadcast outlets interested in [defendant's] services," both as "an alternative *to* WLS and *to* generate competitive interest." The complaint further alleges that defendant requested plaintiff contact Roe Conn's[3] agent, George Hiltzik, so that plaintiff could assume the lead in negotiating agreements with WLS on behalf of both defendant and Conn.

The complaint then alleges that from September 2002 until September 2003, plaintiff "spent well over [200] hours aggressively and effectively negotiating with WLS and other radio stations for a renewal contract that was satisfactory to [defendant]." In doing so, "[plaintiff] spent a large amount of time researching radio ratings and salaries for similar radio talk show hosts, developing comprehensive presentations for WLS and other radio stations, meeting with WLS officials and officials from other radio stations, and drafting various proposals for WLS." The complaint further alleges that by early September 2003, WLS had made defendant a number of offers, and three "other stations had expressed interest in pursuing employment possibilities for [defendant]." In particular, WLS offered defendant a 10-year renewal contract whereby defendant would be paid over $12 million.

The complaint alleges that on September 11, 2003, defendant instructed plaintiff to cease all negotiations for a one-week period and to terminate all efforts during that time period. On September 22, 2003, defendant executed a letter addressed to plaintiff terminating plaintiff as defendant's agent and legal representative.

On January 23, 2004, plaintiff executed a letter addressed to defendant including a bill for the work performed by plaintiff on defendant's behalf in 2002 and 2003. The bill provided for 170 hours at a billing rate of $475 per hour for the work performed by Todd Musburger, and 40 hours at a rate of $300 per hour for the work performed by Brian Musburger, for a total of $92,750. The bill was not itemized. Defendant refused to pay any portion of the bill.

### 3. Plaintiff's Complaint and Defendant's Affirmative Defenses

Plaintiff filed its verified complaint against defendant on April 1, 2004, which included three counts alleging causes of action for breach of contract, *quantum meruit*, and unjust enrichment, respectively. Counts I and III of the complaint alleging breach of contract and unjust enrichment, respectively, dismissed by the trial court prior to trial because the counts did not state a cause of action, are not before

---

[3]Roe Conn was defendant's co-host of the "Roe and Garry" show from February 1996 to February 19, 2004.

this court. Only the alleged cause of action for *quantum meruit* is before this court. In its complaint, plaintiff was styled "The Law Offices of Todd W. Musburger, Ltd."[4]

On January 19, 2005, defendant filed a verified answer denying the allegations asserted in count II of plaintiff's verified complaint. Further, defendant asserted several affirmative defenses including the following pertinent to this appeal. Defendant asserted that "The Law Offices of Todd W. Musburger, Ltd." was incapable of bringing suit, because it was not a registered Illinois corporation. Defendant also asserted that he previously paid for plaintiff's services in 2002 and 2003 pursuant to the parties' 1998 Agreement. Further, defendant alleged that plaintiff was not entitled to recover a fee for its services because it was terminated "for cause" and breached several fiduciary duties it owed to defendant, which will be further discussed below. The trial court struck defendant's affirmative defense regarding plaintiff's incapacity to sue and the affirmative defense that he previously paid for plaintiff's 2002 and 2003 services under the 1998 Agreement and barred any evidence in support of those claimed defenses.

On January 23, 2007, the day before trial, defendant filed an "emergency motion" to file an additional affirmative defense, *instanter*. Defendant sought to assert that plaintiff was barred from recovering any fee for work performed between September 2002 and September 2003 because it was not licensed as a private employment agency under the Illinois Private Employment Agency Act (Act) (225 ILCS 515/0.01 *et seq.* (West 2006)).[5] The trial court denied defendant's motion for leave to file the additional affirmative defense. Specifically, the trial court found that the Act (225 ILCS 515/0.01 *et seq.* (West 2006)) did not apply to the activities performed by plaintiff on behalf of defendant during 2002 and 2003.

### 4. The Trial

Several witnesses testified at trial before a jury. Plaintiff presented the testimony of Todd Musburger, Brian Musburger, and Zemira Jones (former president and general manager of WLS). Defendant presented the testimony of his wife, Cynthia Fircak, and Walter Maksym, an Illinois attorney retained to offer expert opinion testimony regarding

---

[4]Plaintiff filed articles of incorporation under the name "Todd W. Musburger, Ltd." with the Illinois Secretary of State on May 17, 1982.

[5]On appeal, defendant argues that the trial court erred by denying his section 2—619 motion to dismiss (735 ILCS 5/2—619 (West 2006)), on the basis that plaintiff failed to obtain licensing as a private employment agency under the Act. However, defendant does not cite to and our review of the record does not reveal a section 2—619 motion to dismiss.

the *quantum meruit* value of the services rendered from September 2002 to September 2003.

On direct examination, Todd Musburger testified that he graduated from the DePaul University College of Law in 1973, and in 1980 founded plaintiff law firm. He characterized plaintiff law firm as an "entertainment law practice." He has been president of plaintiff law firm since it was founded and represents clients in the television, radio, publishing, and other media fields. Plaintiff law firm's concentration "is devoted generally to the negotiation of the personal service contracts that [plaintiff law firm's] clients are asked to enter into." His hourly billing rate for work personally performed in 2003 was $475 per hour, which he testified was a reasonable and customary fee for an "entertainment lawyer" with his experience and ability. Todd is and at all relevant times was the only attorney in the law firm. The firm employed several employees, including Todd's son, Brian Musburger. Brian assists in negotiations and analyzes financial figures for radio and television ratings. Brian's billing rate for 2003 was $300 per hour, which Todd testified was a reasonable and customary fee for services performed by a person with Brian's expertise in the entertainment field.

Todd Musburger then described plaintiff law firm's fee arrangements with the clients it represents. He testified that plaintiff law firm is typically paid a percentage of the total amount of compensation obtained in a contract when representing a client. The fee is paid over the term of the personal services contract obtained for the client and agreed to by the client. For example, if a client agrees to a three-year personal services contract, plaintiff's fee is paid over that same three-year period on a monthly basis.

Todd first met defendant in the mid-1990s when defendant worked as a radio talk show host on WLS-AM in Chicago. In 1998, defendant hired plaintiff law firm to negotiate the terms of the renewal of his contract with WLS. The negotiations lasted six months and ended successfully with a five-year contract commencing on February 19, 1999, and terminating on February 18, 2004. Plaintiff law firm was paid for its work in negotiating the 1999 agreement.

Todd Musburger further testified that defendant requested their services again in 2002 to negotiate a renewal of the contract that was scheduled to terminate in 2004. Defendant desired a contract where he would be paid an annual salary of at least $2.4 million. He testified that he believed that defendant's expectations were unreasonable, but agreed to represent defendant in his quest to obtain the desired result.

Todd Musburger offered an exhibit (plaintiff's No. 5) into evidence which consisted of a compilation of records assembled after plaintiff's

termination in September 2003 showing the work performed in 2002 and 2003. The records were not created contemporaneously with the work performed and were created by using voice and e-mail records, documents produced and received, personal notes, and recollections of work performed by Todd and his son Brian. These records reflected the name of the person performing the services, the time spent, and a description and date of the activity. No objection was made to the admissibility of the records and the trial court received them in evidence.

Todd testified that the records "underestimate[d]" the amount of time plaintiff law firm spent on defendant's behalf in 2002 and 2003. Todd provided testimony spanning over 100 pages in the trial transcript detailing an account of the work performed on an itemized basis from September 2002 to September 2003 prior to plaintiff's discharge. These activities included the time spent negotiating, developing strategy, researching radio ratings and salaries for similar radio talk show hosts, developing presentations, preparing correspondence, receiving and reviewing correspondence, and participating in both telephone and meeting conferences with representatives from WLS and other radio stations. In the aggregate Todd detailed on an itemized basis 170 hours of work performed by himself personally at a billing rate of $475 per hour, and 40 hours of work performed by his son Brian at a billing rate of $300 per hour.

Todd Musburger testified that in 2002, he was instructed by defendant to contact Conn's agent, Hiltzik, to negotiate an informal agreement where plaintiff would assume the lead in negotiations with WLS concerning the renewal of both defendant's and Conn's contracts. He testified to several contractual offers made by WLS by early September 2003 for both defendant and Conn. In particular, WLS offered both defendant and Conn a 10-year renewal contract where both defendant and Conn would each be paid over $1.2 million per year. Todd relayed the offer to defendant. Dissatisfied with the offer, defendant instructed Todd to first cease all negotiation for a one-week period and then instructed him to confer with defendant's wife, Cynthia Fircak, regarding all matters related to the negotiation of a contract renewal from that point forward. Todd testified that he did not cease negotiations, but continued in his efforts by scheduling meetings with WLS representatives subsequent to defendant's instruction to the contrary. For example, Todd testified that he participated in a lunch meeting with Jones of WLS to discuss defendant's contract after he had been instructed to cease negotiations. He felt that ceasing negotiations at that time would have severely undermined defendant's position in the negotiations. During that time, Todd sent a written

agreement to defendant designed to govern the relationship between the law firm and defendant and memorialize the parties' oral agreement to have the written 1998 Agreement govern their relationship for purposes of plaintiff's representation of defendant for a renewal of defendant's contract with WLS, which was set to terminate in February 2004. The new written agreement included a clause, which did not appear in the parties' 1998 written agreement, that the law firm "may render similar services to others, including persons of the same general qualifications and eligibility for similar employment, and such representation shall not constitute a violation of [plaintiff's] fiduciary duty or other obligations." Defendant refused to sign the new agreement. On September 22, 2003, defendant terminated plaintiff as his agent and legal representative in writing.

On cross-examination, Todd agreed that his law firm cannot bill for legal services for Brian because he is not a duly licensed attorney. However, he testified that Brian's work was "nonlegal" and that the time billed for work performed by Brian was nonlegal in nature. Todd testified that the work performed by Brian on defendant's behalf, such as radio broadcast analyses, was needed to calculate defendant's market value, a determination made by calculating show ratings and advertising revenues, to strengthen defendant's position in negotiations with WLS. Todd further testified that he would have performed the services performed by Brian had Brian not performed the services on defendant's behalf.

Brian Musburger was then called as a witness for plaintiff at trial. Brian testified that he is not an attorney and has been employed by plaintiff law firm since 1998, that Todd Musburger is his father, that his duties were to assist in all negotiations on behalf of clients and analyze financial figures for radio and television ratings, and prepare presentations used in the negotiations on behalf of clients. Brian testified that the billing rate for work he performed in 2003 was $300 per hour. Brian also testified concerning the compilation of records assembled after plaintiff's termination in September 2003 for the purposes of billing defendant for work performed. Brian provided testimony detailing an account of the work performed by him on an itemized basis from September 2002 to September 2003. Brian testified that his work was needed to calculate defendant's market value and that his hourly rate was a reasonable and customary fee for the services performed by someone with his level of expertise in the entertainment field.

Zemira Jones testified on behalf of plaintiff through an evidence deposition. He was the president and general manager of WLS in Chicago from November 1995 until June 2004. Since that time he has

been employed with ABC Disney and as vice president of operations for Radio One, Inc.

Jones testified that his duties as president and general manager of WLS included the negotiation of contracts with radio talk show hosts. Jones testified that defendant was one of the radio personalities on WLS-AM during his tenure as WLS's president. He testified that defendant co-hosted the "Roe and Garry" show from February 1996 to February 19, 2004. On February 4, 2003, he received a letter from plaintiff law firm confirming a conversation that he had with Todd Musburger that plaintiff would assume the lead in representing both defendant and Roe Conn with regard to a renewal of their contracts with WLS that were scheduled to expire in 2004.[6] Jones testified that he participated in negotiations with plaintiff on more than one occasion and described Todd Musburger as "a professional who understood the protocols of negotiating broadcast talent." Jones testified that both Todd Musburger and his son Brian Musburger participated in the negotiations for both defendant and Conn. The Musburgers did nothing during those negotiations to prejudice defendant and did not present any other radio talent to him while they represented defendant. Jones also testified that he continued negotiations with defendant's wife, Cynthia Fircak, after the termination of plaintiff law firm.

Defendant testified on his own behalf at trial. He testified that he is a radio talk show host and has worked in that capacity since 1973. In 1973 he attended the Institute of Broadcast Arts in Chicago and was able to secure a position as the night radio show host at WFYR-FM in Chicago. In 1974, defendant secured a mid-day radio talk show host position with a Des Plaines, Illinois, radio station, which he held for four years. In 1977, defendant secured a position as the night radio talk show host for WLUP-FM in Chicago. Shortly after starting at WLUP, defendant secured a position as the co-host of the morning radio talk show at WLUP with then co-host, Steve Dahl. Defendant and Dahl co-hosted that show for 15 years. In 1993, defendant and Dahl ended their mutual participation, and defendant then hosted the afternoon radio talk show at WLUP. In 1994, defendant became a feature reporter for WGN's morning television news show in Chicago. In February 1996, defendant left WGN's morning television news show and joined WLS co-hosting the "Roe and Garry" show with Conn.

---

[6]Conn was represented by an attorney who agreed that Todd would assume the lead in negotiations.

Defendant testified that he first met Todd Musburger in the mid-1990s, and he hired plaintiff law firm as his "agent" in 1998. Defendant hired plaintiff law firm to negotiate a renewal of his contract with WLS that was scheduled to expire in 1999. He entered into a written fee agreement with plaintiff law firm whereby plaintiff law firm would be paid 5% of the gross amount of the contract negotiated by plaintiff on his behalf. Defendant testified that he paid plaintiff 5% of the gross amount on the 1999 contract.

Defendant then testified that in the fall of 2002, he retained the services of plaintiff law firm for the negotiation of the renewal of his contract with WLS that was set to expire in 2004. He testified that he instructed plaintiff to begin negotiations with a salary demand whereby both Conn and he each would be paid $2.4 million per year. He instructed plaintiff to begin negotiations at that figure so that there would be room for negotiation. He testified that he desired an annual salary of a minimum of $1.5 million per year and that he made his desire clear to Todd Musburger. As noted, both Todd and Brian Musburger testified that defendant only expressed his desire for an annual salary of at least $2.4 million.

The offers from WLS and other radio broadcast outlets during the time that plaintiff law firm represented defendant in 2002 and 2003 were unacceptable to defendant. In September 2003, he received an offer from WLS for a 10-year personal services contract for $12 million, which defendant considered to be below his market value. He testified that Todd Musburger became increasingly difficult to reach. In September 2003, defendant received the new written agreement proposal from plaintiff law firm. The new written agreement proposal was designed to supersede the parties' 1998 written agreement. The proposal included a clause giving plaintiff law firm the ability to "render similar services to others, including persons of the same general qualifications and eligibility for similar employment, and such representation shall not constitute a violation of [plaintiff's] fiduciary duty or other obligations." Defendant refused to sign the new agreement proposal.

Soon thereafter defendant orally instructed Todd Musburger to cease all negotiations with WLS for a short period. Despite his instructions Todd met with WLS representatives, and defendant then terminated plaintiff law firm as his agent because he felt that his interests were not being properly represented. His wife, Cynthia Fircak, assumed the role of his agent in negotiations with WLS, and defendant received the bill for *quantum meruit* services of $92,750 on January 23, 2004.

On cross-examination, defendant agreed that had negotiations in 2002 and 2003 been successful and a renewal of his contract achieved, plaintiff would have been entitled to 5% of the gross amount of the contract negotiated on his behalf.

Cynthia Fircak testified as a witness on behalf of defendant at trial. Her testimony substantially supported defendant's testimony.

Defendant called Walter Maksym, an Illinois attorney, retained to offer expert opinion testimony regarding the value of the services rendered by plaintiff to defendant from September 2002 to September 2003. Maksym was disclosed as defendant's Supreme Court Rule 213(f)(3) (210 Ill. 2d R. 213(f)(3)) controlled expert witness prior to trial, and his proposed opinions were disclosed in a 16-page disclosure. Prior to trial, plaintiff presented a motion *in limine* to bar several opinions in the Rule 213 disclosure at trial. The trial court barred Maksym from opining that plaintiff was not entitled to maintain a claim for *quantum meruit* because such a claim is at odds with the parties' understanding of their agreement. Further, Maksym was barred from opining that plaintiff breached its fiduciary duty and could not receive payment for its 2002 and 2003 services because it was not licensed pursuant to the Act.

Maksym did opine at trial that the services performed by plaintiff in 2002 and 2003 were without value. He based his conclusion on his review of plaintiff's compiled records concerning work performed between September 2002 and September 2003. Maksym opined that there are various factors that are appropriate to consider when assessing the value of an attorney's services. The factors are: (1) the time spent by an attorney on an issue; (2) the specific services performed; (3) the normal or customary billing rate for attorneys in the community; (4) the novelty and difficulty of the legal issues; (5) the skill exhibited by the attorney; (6) the experience, reputation and ability of the attorney; (7) the time limitations on the performance of the services; (8) the attorney's relationship with the client; (9) the objective benefit to the client from the attorney's services; (10) the subjective importance to the client of the attorney's services; and (11) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the attorney. Applying these factors to his review of the compiled records submitted by plaintiff in support of its claim in *quantum meruit*, Maksym opined that the services provided by plaintiff to defendant from September 2002 and September 2003 were worth nothing. Maksym opined that plaintiff's services on behalf of defendant during the operative period were of no benefit to defendant because they did not lead to a renewal of defendant's contract. Maksym further opined

that defendant was not obligated to pay for the services performed by Brian Musburger because he was not an attorney and plaintiff could not charge for any legal services performed by him.

## 5. The Jury's Verdict and Postjudgment Proceedings

As noted, count II of plaintiff's verified complaint sought recovery for services rendered, in the amount of $92,750, under a theory of *quantum meruit*. Specifically, the complaint sought $80,750 in legal fees for 170 hours of work performed by Todd Musburger at an hourly rate of $475, and $12,000 in nonlegal fees for 40 hours of work performed by Brian Musburger at an hourly rate of $300. As noted, the jury returned a verdict in favor of plaintiff awarding $68,750 in damages. On January 30, 2007, the trial court entered judgment on that verdict. Defendant filed a posttrial motion which was denied, and on October 13, 2007, filed a section 2—1401 petition to vacate the trial court's January 30, 2007, order claiming the judgment order was void because "The Law Offices of Todd W. Musburger, Ltd." had no standing to bring suit because it was a nonentity. On March 14, 2008, the trial court denied defendant's section 2—1401 petition to vacate its January 30, 2007, order. Defendant filed timely notices of appeal from both the denial of his posttrial motion and the denial of his section 2—1401 petition to vacate the trial court's January 30, 2007, order. We consolidated the appeals on motion of defendant.

## ANALYSIS

This *quantum meruit* action was brought by plaintiff to collect fees for services performed for defendant between September 2002 and September 2003. A discharged attorney, in this case more accurately, a law firm, is entitled to recover the reasonable value of services performed. *Much Shelist Freed Denenberg & Ament, P.C. v. Lison*, 297 Ill. App. 3d 375, 381 (1998); *In re Estate of Callahan*, 144 Ill. 2d 32, 40 (1991).

■ As the trial court recognized, plaintiff law firm could only pursue an action for *quantum meruit* (and could not pursue a cause of action for breach of contract) because it was representing defendant on a contingent basis and was discharged in the midst of that representation. A client may discharge her attorney at any time, with or without cause. *Much Shelist*, 297 Ill. App. 3d at 378, citing *Rhoades v. Norfolk & Western Ry. Co.*, 78 Ill. 2d 217, 227-28 (1979). "When a client terminates her attorney, the contingent-fee contract ceases to exist, and the contingency term is no longer operative." *Much Shelist*, 297 Ill. App. 3d at 378, citing *In re Estate of Callahan*, 144 Ill. 2d at 40. "A discharged attorney may be compensated for the services rendered before the discharge on a *quantum meruit* basis." *Much She-*

*list*, 297 Ill. App. 3d at 379, citing *Rhoades*, 78 Ill. 2d at 230. *Quantum meruit* literally means " 'as much as he deserves.' " *Much Shelist*, 297 Ill. App. 3d at 378, quoting *First National Bank of Springfield v. Malpractice Research, Inc.*, 179 Ill. 2d 353, 365 (1997). "In *quantum meruit* recovery, the former client is liable for the reasonable value of the services received during the attorney's employment." *Much Shelist*, 297 Ill. App. 3d at 379, citing *In re Estate of Callahan*, 144 Ill. 2d at 41. "*Quantum meruit* is based on the implied promise of a recipient of services to pay for valuable services because otherwise the recipient would be unjustly enriched." *Much Shelist*, 297 Ill. App. 3d at 379. In some cases, it is possible for a client to receive services and yet not be enriched in a tangible way. *Much Shelist*, 297 Ill. App. 3d at 379, citing D. Dobbs, Remedies §4.2, at 237 (1973).

An attorney's recovery in *quantum meruit* may be barred if an attorney has engaged in illegal conduct (see *American Home Assurance Co. v. Golomb*, 239 Ill. App. 3d 37, 41-44 (1992)), or the underlying contingency contract violates public policy (see *Much Shelist*, 297 Ill. App. 3d at 380-82). No such circumstance exists here.

*Quantum meruit* is an appropriate cause of action under the circumstances presented in the case at bar. This case is similar to *Much Shelist*, 297 Ill. App. 3d 375, insofar as that case demonstrates that *quantum meruit* is an appropriate cause of action under circumstances presented in this case. In *Much Shelist*, an attorney representing a client in a contingency matter was discharged following the dismissal of the client's complaint on a section 2—615 motion to dismiss for failure to state a cause of action. The client withdrew as a class representative without allowing the attorney to prepare an amended complaint. The attorney filed a three-count complaint against the client for breach of contract, *quantum meruit*, and unjust enrichment. As in this case, the breach of contract and unjust enrichment counts of the complaint were dismissed. The issue on appeal was "whether, under a contingency-fee agreement, plaintiff law firm can recover the *quantum meruit* value for its services rendered before the client discharged it, although there was no recovery." *Much Shelist*, 197 Ill. App. 3d at 376. The court found that even though there was arguably no benefit to the client, the plaintiff was entitled to recover the value of its services prior to its discharge. The lack of any value or benefit received by the client from the legal services rendered by the plaintiff did not prevent the plaintiff from obtaining attorney fees on a *quantum meruit* basis. *Much Shelist*, 197 Ill. App. 3d at 380.

An attorney representing a client on a contingent basis who is discharged prior to the consummation of a transaction is entitled to recover the reasonable value of her services rendered. The attorney is

not, however, entitled to enforce a contractual fee agreement or collect on the contingency. That would unreasonably interfere with a client's right to discharge her attorney at any time. Based on these principals, plaintiff pursued an action in *quantum meruit* and the jury returned a verdict in its favor.

On appeal, as noted, defendant raises five principal contentions claiming that: (1) the jury's verdict is against the manifest weight of the evidence, (2) the trial court erred by denying his motion to dismiss count II of plaintiff's complaint and by denying his motion for leave to file a fifth affirmative defense both asserting that plaintiff could not receive payment for its 2002 and 2003 services because it was not licensed pursuant to the Act, (3) erred by barring defendant's expert from offering certain opinions at trial, (4) erred by barring defendant from presenting evidence that he previously paid for plaintiff's services, and (5) the January 30, 2007, order entering judgment on the jury's verdict should be vacated due to a misnomer of plaintiff law firm in the complaint. We address each of defendant's arguments, but not in the order they are presented.

### 1. The Trial Court Did Not Err by Rejecting Defendant's Claim That Plaintiff Was Barred From Recovering Fees for Failing to Comply With the Licensing Requirements of the Act

Defendant argues that the trial court erred by denying his section 2—619 motion to dismiss count II of plaintiff's complaint, by denying him leave to file a fifth affirmative defense related to the Act (225 ILCS 515/0.01 *et seq.* (West 2006)), and by barring evidence related to plaintiff's alleged failure to comply with the Act.

■ We begin our consideration of this issue with defendant's claim that the trial court erred by denying his section 2—619 motion to dismiss count II of plaintiff's complaint because plaintiff was not licensed to act as a private employment agency under the requirements of the Act. However, as noted, defendant does not cite to and our review of the record does not reveal a section 2—619 motion to dismiss count II of plaintiff's complaint.

It is the responsibility of the appellant to see that the record is complete, to enable a reviewing court to resolve the questions raised since the record on appeal binds the parties and also controls the reviewing court in its consideration of the appeal. *Coombs v. Wisconsin National Life Insurance Co.*, 111 Ill. App. 3d 745, 746 (1982). In the absence of a complete record "the reviewing court must presume the [trial] court acted properly in the absence of a contrary indication in the record." *Coombs*, 111 Ill. App. 3d at 746. Accordingly, defendant's claim that the trial court erred by denying his section 2—619 motion to dismiss count II of plaintiff's complaint must be rejected.

Furthermore, the trial court did not err by denying defendant's motion for leave to file a fifth affirmative defense to count II of plaintiff's complaint. On January 22, 2007, the day before trial, defendant filed a motion for leave to file his fifth affirmative defense, which the trial court denied.

The decision to grant leave to file an amended affirmative defense rests within the sound discretion of the trial court and such a decision will not be disturbed absent an abuse of discretion. *Resolution Trust Corp. v. Holtzman*, 248 Ill. App. 3d 105, 110 (1993); *Champaign National Bank v. Landers Seed Co.*, 194 Ill. App. 3d 1019, 1027-28 (1990) (no abuse of discretion to deny the defendants' request to file a third affirmative defense after a deadline in a scheduling order). An amendment to pleadings is not an absolute right. *Resolution Trust Corp.*, 248 Ill. App. 3d at 110, citing *In re Estate of Sutera*, 199 Ill. App. 3d 531, 540 (1990). Rather, amendments may be allowed only at the trial court's discretion. *Tongate v. Wyeth Laboratories*, 220 Ill. App. 3d 952, 970 (1991) (no abuse of discretion to deny plaintiffs' request to amend their complaint five weeks before trial). "The test to be applied in determining whether the trial court's discretion was properly exercised is whether allowance of the amendment furthers the ends of justice." *Trans World Airlines, Inc. v. Martin Automatic, Inc.*, 215 Ill. App. 3d 622, 628 (1991) (no abuse of discretion in denying defendant's motion to file a second amended counterclaim).

■ In this case, the trial court properly exercised its discretion by denying defendant's motion for leave to file a fifth affirmative defense to count II of plaintiff's complaint the day before trial. Plaintiff's complaint was filed April 1, 2004. Defendant never sought to raise plaintiff's alleged failure to comply with the licensing requirements of the Act until January 22, 2007, the day before trial.

In its determination of whether to allow amendment to pleadings, the trial court can consider the timeliness of such request (*Trans World Airlines, Inc.*, 215 Ill. App. 3d at 627), previous opportunities to assert a claim, and the ultimate efficacy of the claim (*Champaign National Bank*, 194 Ill. App. 3d at 1027). Based upon the timing of defendant's motion and the fact that defendant had approximately three years to assert the affirmative defense and failed to do so, we cannot say that the trial court's decision to deny defendant's motion was an abuse of discretion.

Furthermore, we cannot say that the trial court's denial of defendant's motion for leave to assert a fifth affirmative defense based on plaintiff's failure to be licensed under the Act was an abuse of discretion because the Act does not apply to the services for which plaintiff sought recovery.

Section 1 of the Act requires employment agencies to procure a license to operate from the Department of Labor. 225 ILCS 515/1 (West 2006). It requires them to file a schedule of fees with the Department and provides that "[i]t shall be unlawful for any employment agency to collect or attempt to collect any compensation for any service not specified in the schedule of fees filed with the department." 225 ILCS 515/1 (West 2006). The term "employment agency" is defined in section 11 of the Act as follows:

"Any person engaged for gain or profit in the business of securing or attempting to secure employment for persons seeking employment or employees for employers. However, the term 'employment agency' shall not include any person engaged in the business of consulting or recruiting, and who in the course of such business is compensated solely by any employer to identify, appraise, or recommend an individual or individuals who are at least 18 years of age or who hold a high school diploma for consideration for a position, provided that in no instance is the individual who is identified, appraised, or recommended for consideration for such position charged a fee directly or indirectly in connection with such identification, appraisal, or recommendation, or for preparation of any resume, or on account of any other personal service performed by the person engaged in the business of consulting or recruiting; but this exclusion is not applicable to theatrical employment agencies or domestic service employment agencies." 225 ILCS 515/11 (West 2006).

The Act was enacted to provide regulation for the recruiting and placement industry, which otherwise lacked safeguards to ensure the ethical conduct of businesses and individuals who provided recruiting and placement services. *T.E.C. & Associates, Inc. v. Alberto-Culver Co.*, 131 Ill. App. 3d 1085, 1096 (1985). The Act governs the conduct of employment agencies and addresses the ability of an employment agency to recover fees for the placement of a job applicant with an employer.

In *National Talent Associates, Inc. v. Holland*, 76 Ill. App. 3d 556 (1979), this court examined the scope of the Act. The *National Talent* court found that an agency that photographed children and submitted their photographs to booking agencies for consideration in placing children in advertising commercials was not an "employment agency." The purpose of the Act was central to the *National Talent* court's decision. The court first noted "the general rule that statutes which are regulatory and penal in nature generally require strict construction." *National Talent Associates, Inc.*, 76 Ill. App. 3d at 562. Further the court noted that "the primary purpose of statutory construction is to ascertain and give effect to the intention of the legislature, and in so

doing, courts should consider not only the language used but also the evil to be remedied." *National Talent Associates, Inc.,* 76 Ill. App. 3d at 562. According to the court:

"The evils incident to private employment agencies, which statutes such as the [Act] were enacted to correct, were summarized in a report published by the United States Bureau of Labor in October 1912 (United States Bureau of Labor Bulletin, No. 109, at 36), as quoted in *Adams v. Tanner* (1917), 244 U.S. 590, 601-02, 61 L. Ed. 1336, 1346, 37 S. Ct. 662[, 667,] (Brandeis, J., dissenting), as follows:

' "1. Charging a fee and failing to make any effort to find work for the applicant.

2. Sending applicants where no work exists.

3. Sending applicants to distant points where no work or where unsatisfactory work exists, but whence the applicant will not return on account of the expense involved.

4. Collusion between the agent and employer, whereby the applicant is given a few days' work and then discharged to make way for new workmen, the agent and employer dividing the fee.

5. Charging exorbitant fees, or giving jobs to such applicants as contribute extra fees, presents, etc.

6. Inducing workers, particularly girls, who have been placed, to leave, pay another fee, and get a 'better job.'

Other evils charged against employment agents are the congregating of persons for gambling or other evil practices, collusion with keepers of immoral houses, and the sending of women applicants to houses of prostitution; sometimes employment offices are maintained in saloons, with the resulting evils." '

***

The [Act] *** consists primarily of regulations to remedy such abuses." *National Talent Associates, Inc.,* 76 Ill. App. 3d at 563.

Defendant's claim that plaintiff's failure to comply with the licensing requirements of the Act bars its action to seek recovery for fees related to its representation of defendant in 2002 and 2003 is not persuasive. Plaintiff was not providing recruiting or placement services for defendant. Rather, plaintiff was engaged in negotiating and drafting the terms of defendant's contracts and providing legal counsel on the contract negotiations. Plaintiff law firm represented defendant as his legal counsel and was not sending defendant out to employers to apply for work. Plaintiff was working on a renewal of an existing contract while exploring the industry for a more lucrative contract from other radio and television stations. The services provided by plaintiff to defendant were vastly different than the recruiting and placement services governed by the Act.

The purpose of the Act is clear when all of the sections of the Act are read together in context. The Act is intended to apply to recruiting and placement agencies. An application of the Act's record-keeping requirements to an attorney-client relationship such as that between plaintiff and defendant does not follow logically. The Act requires every licensed private employment agency:

"[T]o keep a complete record in the English language of all orders for employees which are received from prospective employers. Upon request of the Department, a licensee shall verify the date when the order was received, the name of the person recording the job order, the name and address of the employer seeking the services of an employee, the name of the person placing the order, the kind of employee requested, the qualifications required in the employee, the salary or wages to be paid if known, and the possible duration of the job. Prior to the placement of any job advertisement, an employment agency must have a current, bona fide job order, and must maintain a copy of both the advertisement and the job order in a register established specially for that purpose." 225 ILCS 515/3 (West 2006).

Plaintiff was not taking orders for jobs from anyone on defendant's behalf. Defendant was not "applying" for work; he was already employed by WLS. Defendant had an existing contract and retained plaintiff to assist in negotiating a more favorable renewal agreement when the contract was set to expire in 2004. Plaintiff was not "placing a job advertisement." It was hired to negotiate the terms of a renewal contract with defendant's then-employer, WLS, or a new contract with others in the same industry.

For the foregoing reasons, we cannot say that the trial court abused its discretion by denying defendant's motion for leave to file a fifth affirmative defense seeking to assert that plaintiff could not receive payment for its 2002 and 2003 services because it was not licensed to act as an employment agency pursuant to the Act. The trial court properly exercised its discretion in denying defendant's "emergency motion" to file the defense the day before trial. Further, the trial court correctly found that the Act (225 ILCS 515/0.01 et seq. (West 2006)) did not apply to the activities performed by plaintiff on behalf of defendant during 2002 and 2003.

## 2. The Trial Court Did Not Err by Limiting the Scope of Defendant's Expert's Testimony

■ We next consider defendant's argument that the trial court erred by barring defendant's retained Illinois Supreme Court Rule 213(f)(3) (210 Ill. 2d R. 213(f)(3)) controlled expert witness, Walter Maksym, from offering certain proposed opinions. The proposed

opinions of defendant's expert were disclosed in a 16-page disclosure. As noted, the trial court barred defendant's expert from offering certain proposed testimony. In particular, the trial court barred Maksym from giving a legal opinion on legal issues that were to be decided by the trial court. *People v. Munoz*, 348 Ill. App. 3d 423, 440-41 (2004). Maksym was barred from testifying that plaintiff was not entitled to maintain a claim for *quantum meruit* because such a claim was at odds with the parties' understanding of their agreement, that plaintiff breached fiduciary duties it owed to defendant, and that plaintiff was barred from receiving payment for its 2002 and 2003 services due to its failure to be licensed as a private employment agency pursuant to the Act.

The decision of whether to admit expert testimony is within the sound discretion of the trial court, and the trial court's ruling will not be reversed absent an abuse of that discretion. *Snelson v. Kamm*, 204 Ill. 2d 1, 24 (2003). Expert testimony is admissible if the proffered expert is qualified by knowledge, skill, experience, training, or education, and the testimony will assist the trier of fact in understanding the evidence. See *Wiegman v. Hitch-Inn Post of Libertyville, Inc.*, 308 Ill. App. 3d 789, 799 (1999). Here, we cannot say that the trial court abused its discretion by limiting Maksym's testimony to the reasonable *quantum meruit* value of plaintiff's services. The trial court properly barred Maksym's legal opinions that invaded the province of the trial court.

Expert testimony is admissible only if the expert has specialized knowledge that will "assist the trier of fact" in understanding the evidence or in determining a fact at issue. *Grant v. Petroff*, 291 Ill. App. 3d 795, 801 (1997). When determining whether proffered expert testimony assists the trier of fact, it is well settled that "expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible." *Good Shepherd Manor Foundation, Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) (holding that expert's opinions were legal conclusions where expert opined that city's actions violated statute and city's conduct had no legal basis). As such, experts cannot offer "legal conclusions that infringe on the jury's duties." *Munoz*, 348 Ill. App. 3d at 440-41. In effect, it may amount to prejudicial error to allow expert witness testimony " 'with respect to a key legal term in a case if the jury might look to the expert witness for legal guidance on the matter rather than the court.' " *Munoz*, 348 Ill. App. 3d at 441, quoting *Sohaey v. Van Cura*, 240 Ill. App. 3d 266, 283 (1992). It is the duty of the trial court to decide the legal issues; while the role of the jury is to decide factual issues. The trial court instructs the jury as to the law and no expert can

opine as to the law. That is the role of the trial court. *Munoz*, 348 Ill. App. 3d at 441.

The trial court barred the aforementioned opinions because they were legal conclusions. For example, defendant disclosed that his expert would testify that: "[Plaintiff] is not entitled to maintain a claim for *quantum meruit* against [defendant] because such a claim is completely at odds with the reasonable expectations of the parties here, as evidenced by the terms of their agreement and their actions pursuant thereto, and also with the custom and practice in the entertainment industry." This purported opinion is a simple legal conclusion, offers to interpret the parties' agreement, and purports to weigh the credibility of the parties' testimony. Accordingly, we cannot say that the trial court abused its discretion by limiting the scope of Maksym's expert testimony.

### 3. The Trial Court Did Not Err by Barring Defendant From Presenting Evidence That He Previously Paid for Plaintiff's Services

■ We next address the question of whether the trial court erred by barring defendant from presenting evidence that he previously paid for plaintiff's services. Defendant argues that his payments for the work performed by plaintiff in negotiating the 1999 contract between WLS and defendant should satisfy payment for the work performed by plaintiff in negotiating a 2004 renewal contract. Defendant further argues that his expert should have been permitted to offer an opinion that defendant had already paid for plaintiff's 2002 and 2003 services. Defendant's argument is unpersuasive.

Todd Musburger testified that the commission plaintiff received was for negotiating defendant's 1999 contract with WLS. Defendant testified that if plaintiff had completed the negotiations with WLS regarding a renewal of defendant's contract scheduled to expire in 2004, plaintiff would have been entitled to a commission on the new contract.

To the extent that defendant argues that his expert should have been allowed to offer an opinion that defendant had previously paid for the work at issue would have invaded the province of the trial court, which decides legal issues. We cannot say that the trial court's *in limine* ruling precluding that testimony was an abuse of discretion. Motions *in limine* are designed to produce a trial without the introduction of prejudicial material. *Konieczny v. Kamin Builders, Inc.*, 304 Ill. App. 3d 131, 136 (1999). On appellate review, a trial court maintains broad discretion in the admission of evidence and in ruling upon a motion *in limine. Green v. Union Pacific R.R. Co.*, 269 Ill. App. 3d 1075,

1082 (1995). A trial court's decision on a motion *in limine* will not be disturbed absent an abuse of discretion. *Hallowell v. University of Chicago Hospital*, 334 Ill. App. 3d 206, 210 (2002). Because the evidence at trial, including the testimony of defendant, showed that plaintiff would have been entitled to a commission on a new contract had a contract been reached between defendant and WLS in 2003 or 2004, there was also no basis for defendant's expert to offer an opinion that plaintiff had previously been paid for the work performed toward that goal. "An expert's opinion is only as valid as the basis and reasons for the opinion." *Wilson v. Bell Fuels, Inc.*, 214 Ill. App. 3d 868, 875 (1991), citing *McCormick v. Maplehurst Winter Sports, Ltd.*, 166 Ill. App. 3d 93, 100 (1988). Expert opinions lacking a sufficient factual basis are properly barred. See *Torres v. Midwest Development Co.*, 383 Ill. App. 3d 20, 28-31 (2008). Having found that Maksym's opinion that plaintiff had been previously paid for the work performed in 2002 and 2003 lacked a factual basis, we again cannot say that the trial court abused its discretion by barring his testimony to that effect.

### 4. The Jury's Verdict and Damage Award Was Not Against the Manifest Weight of the Evidence

■ We now address whether defendant is entitled to a new trial based on his argument that the jury's verdict was against the manifest weight of the evidence. " '[O]n a motion for a new trial a [trial] court will weigh the evidence and set aside the verdict and order a new trial if the verdict is contrary to the manifest weight of the evidence.' " *Maple v. Gustafson*, 151 Ill. 2d 445, 454 (1992), quoting *Mizowek v. De Franco*, 64 Ill. 2d 303, 310 (1976). " ' "A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary and not based upon any of the evidence." ' " *Buckholtz v. MacNeal Hospital*, 337 Ill. App. 3d 163, 168 (2003), quoting *Maple*, 151 Ill. 2d at 454, quoting *Villa v. Crown Cork & Seal Co.*, 202 Ill. App. 3d 1082, 1089 (1990). A trial court's ruling on a motion for a new trial will not be reversed except in those instances where it is affirmatively shown that it clearly abused its discretion. *Maple*, 151 Ill. 2d at 455, citing *Reidelberger v. Highland Body Shop, Inc.*, 83 Ill. 2d 545, 548 (1981); *Duffek v. Vanderhei*, 81 Ill. App. 3d 1078, 1087 (1980); *Prange v. Wallenburg*, 27 Ill. App. 3d 618, 626 (1975); *Yocco v. Barris*, 16 Ill. App. 3d 113, 115 (1973). In determining whether a trial court abused its discretion, the reviewing court should consider whether the jury's verdict was supported by evidence and whether the losing party was denied a fair trial. *Maple*, 151 Ill. 2d at 455, citing *Reidelberger*, 83 Ill. 2d at 549. Furthermore, it is important to keep in mind that

" ' "the presiding judge in passing upon the motion for new trial has the benefit of his previous observation of the appearance of the witnesses, their manner in testifying, and of the circumstances aiding in the determination of credibility." ' " *Maple*, 151 Ill. 2d at 456, quoting *Buer v. Hamilton*, 48 Ill. App. 2d 171, 173-74 (1964), quoting *Hulke v. International Manufacturing Co.*, 14 Ill. App. 2d 5, 47 (1957). If the trial judge, in the exercise of his discretion, finds that the verdict is against the manifest weight of the evidence, he should grant a new trial; on the other hand, where there is sufficient evidence to support the verdict of the jury, it constitutes an abuse of discretion for the trial court to grant a motion for a new trial. *Maple*, 151 Ill. 2d at 456, citing *Kitsch v. Goode*, 48 Ill. App. 3d 260, 270-71 (1977); *Morella v. Melrose Park Cab Co.*, 65 Ill. App. 2d 175, 181-83 (1965). The manifest weight of the evidence standard is applied not only to a jury's verdict but also to a jury's damage award. The trier of fact is responsible for determining the amount of damages, and its determination should not be altered unless the determination is not supported by the evidence or is obviously the result of passion or prejudice. *Stein v. Spainhour*, 167 Ill. App. 3d 555, 561 (1988).

At trial, the testimony of Todd Musburger, Brian Musburger, Zemira Jones, defendant, and defendant's wife, Cynthia Fircak, all highlighted the nature and the difficulty of the negotiations undertaken on behalf of defendant, the stakes of the negotiations, the degree of responsibility involved, and the time and labor required. Todd and Brian Musburger testified regarding the amount of time spent negotiating on behalf of defendant, developing strategy, researching radio ratings and salaries for similar radio talk show hosts, developing presentations, and meeting with officials from WLS and other radio stations.

Todd Musburger's testimony regarding the work performed by plaintiff law firm on defendant's behalf spanned over 100 pages in the trial transcript. Both Todd and Brian Musburger provided a month-by-month account of the work performed by them personally on an itemized basis.

Zemira Jones, president and general manager of WLS, corroborated Todd and Brian Musburger's testimony, noting that plaintiff performed valuable services for defendant. Todd and Brian Musburger both testified to the usual and customary fee in the community for their services. During the time period at issue, Todd Musburger's time was billed at $475 per hour, and Brian Musburger's time was billed at a rate of $300 per hour.

Defendant received numerous offers from WLS while plaintiff represented him in contract negotiations. Both defendant and Fircak

testified that plaintiff obtained a number of offers from WLS, including a 10-year renewal contract offer to which Meier would have been paid over $12 million.

We note the fact that Brian Musburger is not an attorney and that the complaint in the case at bar sought recovery of $12,000 in damages for 40 hours of work at an hourly rate of $300 per hour for his work. In order for his services to be separately reimbursable, the cost of Brian's services must not be an overhead cost as would be the cost of other staff employee's work. *Merchandise National Bank of Chicago v. Scanlon*, 86 Ill. App. 3d 719, 727-28 (1980). The testimony at trial established that Brian's role at plaintiff law firm was to develop presentations, prepare industry analyses by determining what other similar talk show hosts were earning, and assist in negotiations. The testimony at trial also established that the services provided by Brian were not legal in nature and were not defrayed by Todd's fees. Generally, overhead office expenses, namely, expenses that an attorney regularly incurs regardless of specific representation, including telephone charges, in-house delivery charges, in-house photocopying, check processing, newspapers subscriptions, and in-house paralegal and secretarial assistance, are not recoverable as costs. *Johnson v. Thomas*, 342 Ill. App. 3d 382, 401 (2003), citing *Harris Trust & Savings Bank v. American National Bank & Trust Co. of Chicago*, 230 Ill. App. 3d 591, 599 (1992); *Kaiser v. MEPC American Properties, Inc.*, 164 Ill. App. 3d 978, 989 (1987). Such overhead refers to fixed expenses which are already reflected in an attorney's hourly rate. *Johnson*, 342 Ill. App. 3d at 402, citing *Harris Trust & Savings Bank*, 230 Ill. App. 3d at 599.

In *Scanlon*, this court considered the propriety of an award of fees for work performed by an Illinois Supreme Court Rule 711 "certified senior law student," who among other things performed legal research on behalf of a client suing a bank for violation of certain provisions of the Truth in Lending Act (15 U.S.C. §§1631, 1639(a) (1970)). *Scanlon*, 86 Ill. App. 3d at 725-28. The *Scanlon* court noted that unlike the work of secretaries and other supporting personnel, the work of senior law students is, in many instances, work of a kind which will or ought to be performed, if not by them, by attorneys. *Scanlon*, 86 Ill. App. 3d at 727. The court further noted that " '[u]nder contemporary circumstances it seems unrealistic' " to require that work which requires less expertise and experience must be performed by counsel in order to be compensated. *Scanlon*, 86 Ill. App. 3d at 727, quoting *People v. Atkinson*, 50 Ill. App. 3d 860, 867 (1977). The court found that the work performed by the "certified senior law student" was separately recompensable because although remaining the responsibil-

ity of counsel and done under his supervision, certain work performed by nonattorneys when found to be economic and necessary should be compensated. *Scanlon*, 86 Ill. App. 3d at 727-29.

In the case at bar, plaintiff's evidence demonstrated that the work performed by Brian on defendant's behalf was not simply an overhead cost that was reflected in Todd's hourly rate. Both Todd and Brian Musburger testified that Brian's work was necessary for the representation of defendant and could not be performed by other staff employees, and would otherwise have been performed by Todd. Accordingly, the services performed by Brian, discussed above, were separately recompensable to plaintiff law firm.

Further, the jury returned a general verdict in the amount of $68,750, with no indication at how it arrived at that figure. As a result, this court cannot determine the manner by which the jury reached its verdict. Plaintiff sought $92,750 in damages. Plaintiff's evidence showed Todd Musburger's work valued at $80,750, and Brian Musburger's work valued at $12,000. The jury heard all of the evidence and made its own determination as to what was a fair, customary, and reasonable fee.

Based upon the foregoing, we cannot say that the jury's verdict was against the manifest weight of the evidence. As a result, we cannot find that the trial court abused its discretion by denying defendant's posttrial motion for a new trial.

### 5. Misnomer

■ We continue our analysis with a consideration of defendant's final contention on appeal; namely, that the January 30, 2007, order entering judgment on the jury's verdict should be vacated because "The Law Offices of Todd W. Musburger, Ltd." lacked the legal capacity to sue because it was not a registered Illinois corporation. Defendant asserted this argument as an affirmative defense to plaintiff's complaint and in its Illinois Code of Civil Procedure section 2—1401 (735 ILCS 5/2—1401 (West 2006)) petition for relief from judgment. In making this argument before the trial court, defendant requested the trial court to take judicial notice of the records of the Illinois Secretary of State demonstrating that "The Law Offices of Todd W. Musburger, Ltd." did not exist, and that plaintiff had not filed for an assumed corporate name pursuant to section 4.15 of the Illinois Business Corporation Act of 1983 (805 ILCS 5/4.15 (West 2004)).

Plaintiff claims that it was a misnomer when it identified itself as "The Law Offices of Todd W. Musburger, Ltd." rather than "Todd W. Musburger, Ltd." in its complaint. Plaintiff argues that the fact that it misstyled itself in the complaint did not bar its claim from going

forward and does not render an otherwise valid judgment void. We agree.

Misnomer is a mistake in name or the provision of an incorrect name to the person in accusation or pleading. *Bristow v. Westmore Builders, Inc.*, 266 Ill. App. 3d 257, 260 (1994), citing Black's Law Dictionary 1000 (6th ed. 1990). Misnomer means nothing more than a party is styled in other than his or her own name. *Bristow*, 266 Ill. App. 3d at 260, citing 59 Am. Jur. 2d *Parties* §243 (1987). The consequence of a misnomer is explained in section 2—401(b) of the Code (735 ILCS 5/2—401(b) (West 2004)). That section provides, in relevant part:

"(b) Misnomer of a party is not a ground for dismissal but the name of any party may be corrected at any time, before or after judgment, on motion, upon any terms and proof that the court requires." 735 ILCS 5/2—401(b) (West 2004).

Simply, while an opposing party may require that a misnomer be corrected, he or she cannot force a dismissal for the misnomer. *Bristow*, 266 Ill. App. 3d at 261, citing *Sjostrom v. McMurray*, 47 Ill. App. 3d 1040, 1043 (1977). Ordinarily, a misnomer can be corrected through a motion to amend. *Thompson v. Ware*, 210 Ill. App. 3d 16 (1991), citing 735 ILCS 5/2—616(c) (West 2006) ("[a] pleading may be amended at any time, before or after judgment, to conform the pleadings to the proofs").

However, misnomer must be distinguished from mistaken identity. Where misnomer occurs (plaintiff sues the right party under the wrong name), plaintiff can simply correct the mistake pursuant to section 2—401 of the Code (735 ILCS 5/2—401 (West 2004)). However, if mistaken identity occurs (plaintiff sues the wrong party), amendment must meet the requirements of the relation back provision, section 2—616 of the Code (735 ILCS 5/2—616 (West 2004)). *Estate of Henry v. Folk*, 285 Ill. App. 3d 262, 264 (1996); *Borg v. Chicago Zoological Society*, 256 Ill. App. 3d 931, 934 (1993). The question of whether misnomer or mistaken identity is involved depends on the intent of the parties, including the plaintiff's subjective belief; however, plaintiff's belief is not the exclusive consideration. *Henry*, 285 Ill. App. 3d at 264.

Although section 2—401 clearly relates to either party, misnomer generally occurs with, and the vast majority of cases involve, defendants who have been improperly named. See *Bristow*, 266 Ill. App. 3d at 261. As *Bristow* stated, it is "relatively unusual" when plaintiff improperly identifies itself. *Bristow*, 266 Ill. App. 3d at 261. *Bristow* itself involved that "relatively unusual" situation and is instructive in the case at bar. In *Bristow*, plaintiff filed suit in the

name of a corporation rather than as a sole proprietor. *Bristow*, 266 Ill. App. 3d at 258. The court rejected defendant's contention that the complaint was a nullity because the corporation was a nonexistent legal entity. *Bristow*, 266 Ill. App. 3d at 261-62. Rather, it concluded that the case involved misnomer. *Bristow*, 266 Ill. App. 3d at 261-62.

In arriving at its conclusion, the *Bristow* court examined the holdings of two other Illinois cases: *Calvert Distillers Co. v. Vesolowski*, 14 Ill. App. 3d 634 (1973), and *Alton Evening Telegraph v. Doak*, 11 Ill. App. 3d 381 (1973).

As the *Bristow* court noted, in *Calvert*, the court rejected the defendants' contention that a lawsuit filed against them was a nullity because the plaintiff was a nonexistent legal entity. In its complaint, the plaintiff had styled its name, in part, "House of Seagram, Inc." The actual plaintiff, however, was "Joseph E. Seagram and Sons, Inc.," the company into which House of Seagram had merged. In rejecting the defendants' argument, the court noted that there was no reason to render the suit a nullity. All parties were fully aware of the identities of the actual litigants and an actual plaintiff existed. *Calvert Distillers Co.*, 14 Ill. App. 3d at 636.

The *Alton* court, on the other hand, affirmed the grant of a defendant's motion to vacate a default judgment where the plaintiff named in the complaint lacked the legal capacity to sue. In affirming, the court determined that the underlying judgment had not been rendered in the name of a natural or artificial person having the capacity to sue and that there were no facts properly before the court that identified an entity capable of suing. *Alton Evening Telegraph*, 11 App. 3d at 382. The *Alton* court, however, never addressed the question of misnomer; instead relying on a section of the then-existing Civil Practice Act, which required that a plaintiff be possessed of a legal entity as a natural, artificial or quasi-artificial person. *Alton*, 11 Ill. App. 3d at 381.

All parties in the instant case were fully aware of the identities of the actual litigants, an actual plaintiff existed, and defendant was aware of the actual plaintiff because he made certain demands upon it, and the defendant suffered no prejudice. *Bristow*, 266 Ill. App. 3d at 262. Similar to this case also is *Sjostrom v. McMurray*, 47 Ill. App. 3d 1040 (1977), where plaintiff filed suit in the name of a corporation rather than individually "doing business as." Again, the corporate entity was nonexistent. The court found this was a case of a misnamed plaintiff that was correctable under then-section 21(2) of the Civil Practice Act (Ill. Rev. Stat. 1973, ch. 110, par. 21(2) (now section 2—401 (735 ILCS 5/2—401 (West 2004)))). *Sjostrom,* 47 Ill. App. 3d at 1043.

The facts of the case at bar are even more compelling for the application of the doctrine of misnomer than the facts in *Bristow* and *Sjostrom*. In the case at bar, an actual corporate plaintiff does, and at all relevant times did, exist; namely, "Todd W. Musburger, Ltd." As noted, plaintiff filed articles of incorporation under the name "Todd W. Musburger, Ltd." with the Illinois Secretary of State on May 17, 1982. Defendant cannot seriously contend that he was unaware that plaintiff was a real party in interest in the case at bar.

Based on the foregoing, we conclude that this case involves misnomer and, accordingly, the trial court did not err when it struck defendant's affirmative defense and denied defendant's section 2—1401 petition for relief from judgments arguing that plaintiff was a nonentity lacking the legal capacity to sue.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

HALL, J., concurs.

JUSTICE GARCIA, specially concurring:
I concur in the judgment.